173 So. 266

## CITY OF MOBILE v. ROUSE.

### SAME v. GIBSON.

### 1 Div. 961, 962.

Supreme Court of Alabama.

March 18, 1937.

Outlaw & Seale and V. R. Jansen, all of Mobile, for petitioner.

D. R. Coley, Jr., of Mobile, opposed.

BROWN, Justice.

Appellee Rouse is a barber, operating a barber shop in the City of Mobile. He served one of his customers and charged such customer for such service less than the minimum charge prescribed by an ordinance of said municipality. For this offense he was arrested, tried and convicted in the recorder's court.

Appellee Gibson was in the clothes cleaning business and "accepted for pressing and cleaning, and did press and clean a suit of men's clothes for the charge of fifty cents," which was less than the minimum charge prescribed by an ordinance of the city for such service.

Both applied for and obtained an appeal to the circuit court of Mobile county, and on their trials questioned the validity of the ordinances under which they were convicted, on the ground that the fixation of a minimum charge for such personal services by ordinance was an invasion of their constitutional liberty. They also questioned the constitutionality of the act of the Legislature approved August 27, 1935, referred to as the Sanderson Act, which purports to confer authority on municipalities having a population of not less than 60,000 and not more than 250,000 inhabitants, to fix by ordinance such minimum price. General Acts 1935, p. 746–748. .

The circuit court ruled in accordance with these contentions and discharged the appellees, and from those judgments the City of Mobile appealed to the Court of Appeals, where the rulings of the circuit court were sustained and said judgments affirmed.

The city applied here for certioraris to bring up and review the rulings of the last-mentioned court.

The declared purpose of the act is to confer on such cities authority to prevent, by ordinance, "ruinous price-cutting" in trades in "which services are rendered upon a person or persons or their clothing or apparels without necessarily involving the sale of merchandise," and thereby prevent "widespread unemployment and economic distress."

The legislative declared basis of the attempted legislation is "a state and national emergency productive of widespread unemployment and disorganization of trade which burdens commerce and affects the public welfare." Acts 1935, p. 746, § 1.

If it is within the competence of the Legislature to confer such power, the ordinances adopted and promulgated in pursuance thereof are valid. So the question presented for decision is: Does said act impinge the liberties of the citizen in denying to him the right to fix the price by contract for which he will sell his labor or service to those who may apply therefor?

It is the consensus of judicial opinion, state and federal, that the right of an individual engaged in an inherently lawful occupation to fix the price for which he will render personal service is a part of the liberty reserved to him against governmental encroachment, protected by the Constitutions, both State and Federal. State v. Goldstein, 207 Ala. 569, 93 So. 308, 311; Ex parte Rhodes (Rhodes v. McWilson), 202 Ala. 68, 79 So. 462, 1 A.L.R. 568; State

ex rel. Fulton v. Ives et al., 123 Fla. 401, 167 So. 394; Meyer v. State of Nebraska, 262 U.S. 390, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446.

In the case first above cited, this court, dealing with the constitutionality of the Act of September 30, 1919, p. 1088, prohibiting "profiteering" by the regulation of profits in private businesses, said: "The question then is, in its last analysis, a very simple one: Does the guaranty of 'liberty' as declared in section 1 of the Bill of Rights, and as preserved by the Fourteenth Amendment to the federal Constitution, protect the citizen in his right to conduct his business and sell his goods according to his own judgment and discretion, and at such prices as he may obtain, so long as the business is inherently lawful, and is honestly conducted, and is in no way devoted to a public use or affected by a public interest? Or, may the police power of the state be constitutionally extended by legislative fiat to the conduct of private business, so as to control the prices of goods, and regulate the profits of traders, or of individuals who may wish to dispose of any article they may happen to own? * * * During the century of Alabama's political existence, no Legislature has ever attempted to exercise the power in question—a persuasive argument that the power has never existed."

After collecting and reviewing the authorities, both state and federal, the court concluded the opinion as follows: "In our judgment this act, in so far as it relates to the prevention and punishment of profiteering, as defined in section 2, is a clear abuse of the police power, and is offensive to the declarations and guaranties of our Bill of Rights, and also to the Fourteenth Amendment to the federal Constitution; and we hold it, to that extent, unconstitutional and void." 207 Ala. 569, at pages 570, 573, 93 So. 308, 314.

In Ex parte Rhodes (Rhodes v. McWilson), supra, it was observed: "When the people of this state, through their representatives, met in convention to form this state government, they reserved to themselves and their descendants and successors certain rights, liberties, privileges, and immunities, which they did not surrender or cede to the government to be created by the convention. They also exacted guaranties of the government so formed to protect *each person* in the state, and secure to him the enjoyment and exercise of these rights, liberties, privileges, and immunities, so reserved against encroachment or destruction thereof by other persons, *whether majorities or minorities* of the whole, or officers of any department of the government itself. Some, but not all, of these rights, liberties, privileges, and immunities, are enumerated in the Bill of Rights, which comprises the first 36 sections of our Constitution. That all this is true is obvious from a reading of the last two sections of the Bill of Rights, as follows:

" 'Sec. 35. That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.

" 'Sec. 36. That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this declaration of rights is excepted out of the general powers of government, and shall forever remain inviolate.' " 202 Ala. 68, 69, 79 So. 462, 463, 1 A.L.R. 568. [Italics supplied.]

In the Florida case cited—State ex rel. Fulton v. Ives et al., 123 Fla. 401, 167 So. 394, 395—the court held that a "Statute empowering board of barber examiners to fix minimum prices to be charged by barbers held unconstitutional as denial of equal protection and due process of law and improper restraint on freedom of contract."

In Meyer v. State of Nebraska, supra, the Supreme Court of the United States, treating what is embraced in the term "liberty" as guaranteed by the Constitution, observed: "While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." 262 U.S. 390, at page 399, 43 S.Ct. 625, 626, 67 L. Ed. 1042, 29 A.L.R. 1446.

But it is insisted that this law was enacted by the Legislature to meet an emergency. That emergencies do not authorize the suspension of the Constitution and its guaranties was settled nearly three quarters of a century ago, in Ex parte Milligan, 4 Wall. 2, 120, 121, 18 L.Ed. 281, decided in December 1866.

Milligan, a civilian, was tried by a military court for an alleged crime and was sentenced to suffer death. His sentence was approved by the President, and orders given to execute him. He applied to the civil court for his discharge, on the ground that the Constitution guaranteed him a trial by jury, and said military court was without jurisdiction. In disposing of the case, the Supreme Court made the following pertinent observations:

"These securities for personal liberty thus embodied, were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. And so strong was the sense of the country of their importance, and so jealous were the people that these rights, highly prized, might be denied them by implication, that when the original Constitution was proposed for adoption it encountered severe opposition; and, but·for the belief that it would be so amended as to embrace them, it would never have been ratified.

"Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are *now,* after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, *at all times, and under all circumstances.* No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be *suspended during any of the great exigencies of government.* Such a doctrine leads directly to anarchy or despotism." (Italics supplied.) 4 Wall. 2, 120, 121, 18 L.Ed. 281.

The act involved in Franklin v. State ex rel. Alabama State Milk Control Board, 232 Ala. 637, 169 So. 295, 299, was sustained on the ground that the milk industry was "affected with a public interest."

Personal service can not become affected "with public interest" unless the service rendered is official in character, or is rendered in connection with a business "affected with public interest" or "devoted to a public purpose."

The judgment here is that the Legislature exceeded its power· in attempting to authorize said cities and towns to fix prices for personal services.

The writs of certiorari to the Court of Appeals are therefore denied.

Writs denied.

ANDERSON, C. J., and GARDNER, THOMAS, FOSTER, and KNIGHT, JJ., concur.

BOULDIN, J., dissents.