HOLLINGSWORTH *v.* STATE BOARD OF BARBER EXAMINERS.

[No. 27,381. Filed June 28, 1940.]

*Ira M. Holmes,* of Indianapolis, for appellant.

*Omer S. Jackson,* Attorney General; *Thomas Longfellow,* Deputy Attorney General, and (*Clyde P. Miller,* of Indianapolis, of counsel), for appellee.

SHAKE, J.—The sole question presented by this appeal is the constitutionality of sections 3 and 4, of chapter 108, Acts of 1939, §§ 63-330, 63-331, Burns' 1933 (Supp.), §§ 4082-3, 4082-4, Baldwin's Supp. 1939. These sections are as follows:

"Sec. 3. Minimum Price Agreements. Whenever a scale of minimum prices for barber services shall be submitted to the State Board of Barber Examiners by any organized and representative group of barbers, after such scale has been agreed upon and signed by at least eighty per cent of the barbers licensed by said board and operating in each city or town within any trade area, limited and defined

in the scale, the State Board of Barber Examiners shall have power to approve such agreements and to declare and establish within such trade area, by official order, the minimum prices for any and all work or service usually performed in barber shops.

"Before approving such agreements the board, within thirty days after such schedule is submitted, shall determine by investigation, whether such suggested prices are reasonable and sufficient to enable barber shops in such trade area to operate in keeping with the purposes of this act in minimizing danger to the public health and safety incident to such work.

"In determining reasonable minimum prices, the board shall take into consideration the necessary costs incurred in the particular trade area in maintaining barber shops in a clean, healthful and sanitary condition. If the board shall find after investigation that the minimum prices fixed in any such trade area are insufficient to provide adequate service for protecting the public health and safety, or that such prices are excessive or unreasonable such agreement shall not be approved.

"Sec. 4. Opening and Closing Hour Agreements. The Board of Barber Examiners shall have power to approve and, by official order, to establish the days and hours when barber shops may remain open for business, whenever agreements fixing such opening and closing hours have been signed and submitted to the board by any organized and representative group of barbers, and after such agreements have been signed by at least eighty per cent of the barbers licensed by said board and operating in any trade area of this state, and shall have like power to investigate the reasonableness and propriety of the days and hours fixed by such agreements as is conferred under Sec. 3 of this act concerning price agreements."

Section 1 of said act declares that barbering and the operation of barber shops is affected with a public interest, and that the provisions of said act will tend to protect the public health and safety by facilitating adequate sanitary inspection and supervision and by

safeguarding fair competition. Section 2 defines the term "trade area" as used in sections 3 and 4 as "any circumscribed locality of the state but applicable only to the urban territory—whether of cities or towns—within the same, though such 'trade area' may consist of but one city or one town, or a number of cities and towns, not less than all such cities and towns within the territory embraced in the trade area."

It is important to have a clear understanding as to how the act will operate if sections 3 and 4 are permitted to stand. The initiative for the establishment of a scale of minimum prices or regulations governing opening and closing hours must be taken by one or more licensed barbers. The boundaries of a proposed trade area must be determined upon. This area may consist of a single incorporated town or city, or any part of or all of the State of Indiana. The lines dividing existing political subdivisions may be ignored and the state may be gerrymandered as the proponents see fit, so long as the regulations are made applicable to all the cities and towns in the proposed area. A city, irrespective of its size, may not be embraced in more than one area, and barbers and shops without cities and towns may not be made subject to the act. Having determined upon a trade area, the proponents must next establish a scale of minimum prices for barber services, if they are proceeding under section 3, or a schedule of opening and closing hours, if proceeding under section 4. This scale or schedule must then be agreed upon by at least 80 per cent. of the licensed barbers operating in each of the cities and towns situated in the contemplated trade area. After sufficient signatures are obtained, the next step for the proponents is to find some "organized and representative group of barbers" who will submit the proposed scale

or schedule to the State Board of Barber Examiners. The act does not undertake to define what is meant by an "organized and representative group of barbers," nor is it specified that the members of such group shall be licensed barbers or barbers operating in the cities and towns of the trade area proposed to be created. Within 30 days after such scale or schedule is submitted to the state board, said board shall determine by investigation whether such suggested prices or closing regulations are reasonable. If it finds that the proposed rates or regulations are reasonable, it may approve the same, and thereupon said rates or regulations shall have the force and effect of law and be binding upon all licensed barbers and barber shops in the municipalities situated in the trade area. If the board finds that the proposed schedules are unreasonable, they shall be rejected. The board has no authority to change, modify, or adjust any scale or schedule submitted to it, or to vary the boundaries of any proposed trade area. Subsequent sections of the act provide that after a trade area has been established and a schedule of rates or regulations has been approved, the board may revoke the license of any barber failing to comply therewith, and it may also apply to a court of equity for an injunction to enforce said regulations.

This court will not concern itself with the expediency of or need for legislation. These matters are for the members of the General Assembly, who are directly answerable to the people, by whom they are elected. We are, however, charged with the responsibility of determining, when called upon to do so, whether a legislative act comports with the Constitution. Among the limitations imposed upon the Legislature are those that it shall not delegate its lawmaking power to others and that it shall not pass any

law, the taking effect of which shall be made to depend upon any authority, except as provided in the Constitution. Constitution of Indiana, Article 4, § 1; Article 1, § 25.

We are therefore required to say whether the sections of the act of 1939 now under consideration do violence to the above provisions of the Constitution. The ■ prohibition against the delegation of authority is a mandate of very great importance, calculated to confine the legislative branch to its proper sphere. A violation of that express provision would strike with deadly force at those checks and balances that are essential to the maintenance of our form of government. The corollary injunction with respect to the authority under which laws shall take effect is equally vital. Under our constitutional system the functions of the government are precisely defined and responsibilities are definitely placed. These are positive commands of the people, acting in their sovereign capacity, and they may not be ignored. A delegation of legislative authority does not occur when it is provided in a statute that some administrative officer or board shall have the responsibility of determining whether facts or a state of things exists upon which the law makes or intends to make its own action depend. There is a clear distinction between the delegation of power to make the law, which necessarily involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. *Fry, Excise Director* v. *Rosen* (1934), 207 Ind. 409, 189 N. E. 375.

It might have been provided in the act of 1939 that reasonable charges should be paid for barber services,

and that there should be reasonable regulations with respect to the time of opening and closing barber shops, either throughout the State of Indiana or in certain parts of the state duly classified for that purpose. It would then have been proper to have invested the state board with the functions of determining whether unreasonable practices prevailed and what reasonable regulations, under the terms of the act, should be substituted therefor. Under an act of that character it could not be said that the Legislature had delegated the lawmaking power, though it would have delegated the power to determine the facts upon which the law was intended to operate. The act of 1939 accomplishes no such purpose. It does not declare that reasonable regulations shall control barbering throughout the state, nor does it classify parts of the state to that end. It is left to persons engaged in barbering to say whether there shall be regulations, having the force and effect of law, in parts of the state to be by them alone determined. This, it seems to us, amounts to a clear delegation of the authority to enact laws on the part of the General Assembly.

A law may also provide that a vote, petition, or other expression of approval on the part of the people affected thereby shall be prerequisite to setting its machinery in operation. Statutes for public improvements and the expenditure of public funds frequently require that a popular vote or a petition signed by a specified number of householders or freeholders shall be a condition precedent to invoking their benefits. *Johnson* v. *Board of Park Commissioners* (1930), 202 Ind. 282, 174 N. E. 91. Local option laws regulating the sale of intoxicating liquors have likewise been upheld. *Groesch* v. *State* (1873), 42 Ind. 547; *State* v. *Gerhardt* (1896), 145 Ind.

439, 44 N. E. 469; *McPherson* v. *State* (1910), 174 Ind. 60, 90 N. E. 610. Such statutes are not comparable to the one now before us. This act does not declare a public policy applicable to the whole state nor to legislatively classified parts thereof. It merely undertakes to say what the law shall be in those undetermined and unascertainable areas where 80 per cent. or more of the licensed barbers take the necessary steps to obtain such a law. The municipalities of the state are not classified for purposes of regulation. Barbers are left free to make their own classifications. The operation of the act is not only initiated by barbers, but they are allowed to exercise absolute control over the territorial limits of any regulation which the state board may promulgate, and the board is merely given the naked choice of approving the schedule submitted to it or doing nothing.

In the practical application of the law, 21 per cent. of the licensed barbers in any given trade area may, by simply refusing to join in agreeing upon a scale or schedule, forestall any regulation whatever, notwithstanding the declared purposes of the act to safeguard fair competition and facilitate adequate sanitary inspection and supervision. It is not inconceivable that the laudable objectives of the law might therefore be defeated by the very persons whose unfair practices and unsanitary methods presumably induced its enactment.

The question with which we are dealing was before the Supreme Court of Wisconsin in *Gibson Auto Co.* v. *Finnegan* (1935), 217 Wis. 401, 407, 408, 259 N. W. 420. In its fundamentals the Wisconsin statute was substantially like ours, except that the administrative features of the act were lodged in the governor instead of a board, and that when a proposed schedule of charges to be exacted was submitted to the governor, he

was given authority to modify, amend, or terminate it, which our act forbids. Rosenberry, C. J., speaking for the court, said:

"It is contended that the act is an unlawful delegation of the power to make and declare laws vested by the constitution in our legislature. (Art. IV, sec. 1. The legislative power shall be vested in a senate and assembly.) The act under consideration has one distinctive feature which this court has so far never been called upon to consider. No provision of the act can by its terms become effective until some trade or industrial association or group applies to the governor for his approval of a code. After a proposal has once been submitted, the power of the governor to modify, amend, or terminate it is aroused; he has no power whatever to initiate a code. His authority is dependent upon his finding: (1) That the code has been approved by a preponderant majority of the persons engaged in the trade or industry as defined in the act; (2) that no inequitable restrictions are imposed; (3) that the code is not designed to promote monopolies, etc., and (4) that the code is not inequitable as regards the interest of consumers.

"It is true that the code would have no vitality or legal effect if not approved by the governor. However, the question of whether or not there shall be a code, which is nothing more nor less than a law relating to a particular industry, is wholly dependent upon the initial determination of the members of an industry. It is conceivable at least that a code might be proposed under the terms of the act by persons not citizens of the United States, which would, when approved by the governor, become the law of the land.

"It is difficult to conceive of a more complete abdication of legislative power than is involved in this act. Not only is the power to determine whether or not there shall be a law at all delegated to an indefinite class or group, but the governor and all other public officers are rendered powerless to act except upon the initiative of a preponderant majority of a group. It must be borne in mind that the power delegated is not the power to organize

and adopt self-governing ordinances. The power delegated is the power to frame and adopt a code which, when approved, becomes a law with penal sanctions."

The appellee has asserted by way of briefs and in argument that statutes substantially like ours have been sustained in other states. Among the authorities cited to support this contention are the following: *State* v. *McMasters* (1939), 204 Minn. 438, 283 N. W. 767; *Herrin* v. *Arnold* (1938), 183 Okla. 392, 82 P. (2d) 977, 119 A. L. R. 1471; and *Board of Barber Examiners* v. *Parker* (1938), 190 La. 214, 182 So. 485.

The Minnesota case discloses that the statute of that state is radically different from the statute of this state. The Minnesota act specifically authorizes the governor to prescribe, approve, disapprove, modify, amend, or terminate regulations after a public hearing. He is not restricted to approving or disapproving a schedule sub- -mitted by the petitioning group.

The Oklahoma case quotes enough of the statute of that state to disclose that it is similar to the Minnesota law, and likewise different from ours. One of the provisions of the Oklahoma act is as follows:

"That if the Board, after investigation made either upon its own initiative or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have authority to vary or refix the minimum prices for a barber's work in each city or town affected by this act."

It does not appear from the Louisiana decision that the Supreme Court of that state considered the subject of the unauthorized delegation of legislative authority, but enough of the Louisiana statute is quoted to indi-

cate that it is likewise similar to those of Minnesota and Oklahoma, and that it does not contain the obnoxious features embodied in our act.

It is our conclusion that sections 3 and 4, chapter 108, Acts of 1939, are void as constituting an unconstitutional delegation of legislative authority. Having reached this conclusion, we find it unnecessary to consider at this time any of the other objections urged against the act. We therefore hold that the trial court erred in sustaining appellee's demurrer to the appellant's complaint.

· The judgment is reversed, with directions to overrule the demurrer to the appellant's complaint and for further proceedings in conformity with this opinion.

NOTE.—Reported in 28 N. E. (2d) 64.