GIPSON *v.* MORLEY, COMMISSIONER OF REVENUES.

4-9209 233 S. W. 2d 79

Opinion delivered May 22, 1950.

*Kenneth C. Coffelt,* for appellant.

*O. T. Ward* and *Bailey & Warren,* for appellee.

LEFLAR, J. Appellant James A. Gipson, as a citizen and taxpayer, brought this bill in equity for an injunction to restrain the Commissioner of Revenues and the State Treasurer from enforcing or paying out funds for the enforcement of the provisions of Act 282 of the Acts of the General Assembly of Arkansas for 1949. Act 282 contains three principal groups of provisions: (1) It fixes prices at which sales of liquor and related items (not including beer) may be made at wholesale or retail—for wholesale sales the price is fixed at the wholesaler's cost plus 15 percent, and for retail sales at the retailer's cost plus 33 1/3 percent on liquor, plus 45 percent on cordials, liqueurs and specialties, and plus 50 percent on sparkling and still wines (the various items enumerated are defined in the statute) ; (2) a tax of 25 cents per case on liquor and other stated items and 10 cents per case on wine is levied, the proceeds to go into a special fund in the State Treasury ; and (3) there is appropriated from the special fund certain amounts to pay the salaries and expenses of 20 employees in the office of the Commissioner of Revenues whose duty it is to enforce this and all other liquor control laws of the State. Plaintiff Gipson's contention is that Act 282 is unconstitutional under Article II, §§ 3, 18, 19 and 21 of the Constitution of Arkansas. The contention of unconstitutionality is seriously urged however, only as to the group of provisions numbered (1) in the summary just given—those relating to price-fixing. It is virtually conceded that the taxing provisions, and the appropriation for additional employees to police the liquor business in the State, are valid. The Chancellor held the Act to be constitutional, and plaintiff appeals.

The sections of the Constitution upon which appellant relies are as follows:

"§ 3. The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition.

"§ 18. The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.

"§ 19. Perpetuities and monopolies are contrary to the genius of a republic, and shall not be allowed; nor shall any hereditary emoluments, privileges or honors ever be granted or conferred in this State.

"§ 21. No person shall be taken or imprisoned, or disseized of his estate, freehold, liberties or privileges; or outlawed, or in any manner destroyed or deprived of his life, liberty or property, except by the judgment of his peers or the law of the land; nor shall any person, under any circumstances, be exiled from the State."

It is apparent that none of these sections contains a specific prohibition against the type of legislation here enacted. If there is a prohibition it will have to be discovered from the general spirit of the sections, or from some inner essence deemed implicit though not explicit in the words. Furthermore, discovery of such a prohibition would negative the State's regulatory authority under the police power, a constitutional concept which in the past has been held to justify numerous governmental controls exercised over the liquor business.

A practically unlimited right to regulate the liquor traffic has from early times been conceded to the State. "The State has this right, because the authority to sell liquor is a mere privilege, which the State may grant or withhold, as it pleases, or, if it grants this permission at all, it may do so under any conditions which it cares to impose; and this is true . . . even though these

conditions are so onerous as to amount to virtual prohibition of that traffic." *Wade* v. *Horner,* 115 Ark. 250, 258, 170 S. W. 1005, 1008, Ann. Cas. 1916E, 167. "The sale of intoxicating liquors is not a matter of right protected by constitutional guarantees. It is only a privilege, to be exercised under the police power. The General Assembly, in legalizing the traffic, may impose such restrictions as it deems appropriate." *Cook, Commr.* v. *Glazer's Wholesale Drug Co.,* 209 Ark. 189, 195, 189 S. W. 2d 897, 900. *Accord, Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 60 S. Ct. 163, 84 L. Ed. 128.

The only case in which this Court has previously had occasion to pass on the validity of a price-fixing statute is *Noble* v. *Davis,* 204 Ark. 156, 161 S. W. 2d 189, holding unconstitutional an enactment which authorized minimum price schedules for barbers. The decision was that the business of the barber "is one of common right," and that prices charged for barber services have no such effect upon the public peace, health, safety and welfare as to justify a statute fixing minimum prices in a field of business which is one of common right.[1] *Noble* v. *Davis* affords us but little aid in passing upon the validity of a statute designed to regulate a type of business which is admittedly not one of common right.

There are several cases from other jurisdictions in which liquor price-fixing plans have been denied enforcement, but they likewise do not give us much aid. They come from the states of Illinois, New York, Louisiana, and Florida.

The case of *Illinois Liquor Control Commission* v. *Chicago's Last Liquor Store,* 403 Ill. 578, 88 N. E. 2d 15, held the Illinois liquor price control act to be invalid because it violated an Illinois constitutional prohibition against revival or amendment of an earlier act by reference merely. That is a legislative drafting technicality which the Arkansas act completely avoids.

*Levine* v. *O'Connell,* 275 App. Div. 217, 88 N. Y. Supp. (2d) 672, invalidated the New York statute on the ground

---

[1] The concept of common right, or of "natural and fundamental rights," is analyzed in a Comment in (1948) 2 Ark. L. Rev. 203.

that it improperly delegated the price-fixing power to a state board. The New York Court said: "We assume, without deciding, that it would be within the competence of the legislature to determine that mandatory price fixing in the sale of alcoholic beverages would be a proper exercise of the police power. The important point for this case is that the legislature has not done so; on the contrary (it) purports to authorize the State Liquor Authority 'in its discretion'" to establish a price fixing plan. Under the Arkansas act there is no such improper delegation of legislative power to an administrative board; the enactment itself lays down the price fixing rule.

The Louisiana holding appears in *Schwegmann Bros.* v. *Louisiana Board of Alcoholic Beverage Control,* 216 La. 148, 43 So. 2d 248. The statute there was similar to that enacted in Arkansas, and its stated purpose was the regulation and control of the liquor traffic so that it "may not cause injury to the economic, social and moral well-being of the people of the state." The Louisiana Court held that the fixing of wholesale and retail package liquor prices was insufficient by itself to achieve the end sought, that there were too many liquor sales transactions in which prices were left unregulated, that the act was not comprehensive enough to accomplish what it purported to accomplish. Particular emphasis was laid on the fact that there was no regulation of prices on sales of liquor over the bar by the drink, a type of sale which we do not allow in Arkansas, and therefore have no occasion to regulate. No objection is made that the Arkansas statute is not sufficiently comprehensive; no argument is made that it does not regulate enough, rather it is urged that it regulates too much. The Louisiana Court concluded: "It is to be clearly understood that we are not holding that the legislature cannot under any circumstances adopt legislation, pursuant to the state's police power, relating to the establishing of prices on intoxicants with the view and purpose of regulating the liquor traffic and protecting the general welfare of the people. That broad question is not presented by this

case . . ." Contrariwise, that broad question is specifically the one that now is before the Arkansas Court.

The other state in which a liquor price-fixing plan has been invalidated is Florida, where in *Liquor Store* v. *Continental Distilling Corp.,* (Fla.) 40 So. 2d 371, the Florida Court refused to enforce an act which authorized manufacturers to fix binding retail prices on "brand name" goods sold for resale in the state. The Court pointed out: "It is well to remember also that this act applies to every kind of article including such necessities as food and drugs." Then it was stated: ". . . a law which provides for the fixing of minimum prices should contain a yardstick as a guide for the establishment of such ground level prices. The power to determine those prices should not be left to the unleashed discretion of the trade-name owner but should be confined within impregnable specified boundaries. A definite measuring stick should be set forth in the body of the act. This statute contains no such rule." The Arkansas statute does contain such a rule, a very specific one, and besides it sets up a price fixing structure only for the liquor business, as distinguished from all retail businesses.

In contrast with these cases is *Reeves* v. *Simon,* 289 Ky. 793, 160 S. W. 2d 149, which sustained Kentucky's Distilled Spirits and Wine Fair Trade Act, a price fixing measure similar to Arkansas' Act 282 of 1949. The decision was squarely on the constitutionality of the enactment. In the course of its opinion the Kentucky Court said:

"The proof shows that due to price-cutting and to cut-throat competition by producers, wholesalers and retailers, chaos existed in the trade which resulted in law violations, excessive use of intoxicants and other conditions detrimental to the commonweal. The evidence is to the effect that the fixing of minimum prices has had a stabilizing effect upon the industry, done away with ruinous competition, resulted in less consumption of intoxicants by the public and has caused liquor to be sold in more wholesome surroundings . . .

"(It was urged that) the mark-up in the resale price was for the sole benefit of the dealer and that the Act ran afoul of section 3 of our Constitution which forbids the granting of exclusive emoluments or privileges except for public service. The natural status that anybody might sell whiskey has long since ceased to exist and its sale under police power for years has been limited to select persons and only at selected places . . .

"The answer to the argument that this statute is more inclined to enrich the dealer than it is to regulate the sale of whiskey for the public benefit, is that courts are not concerned with the wisdom or appropriateness of legislation, but the public benefit to be derived therefrom and the adequacy thereof is primarily for the Legislature. Unless it is clear the statute has no reasonable relation to a proper legislative purpose and is arbitrary and discriminatory and without substantial basis, the courts will not interfere.

"Innumerable methods have been devised by the legislatures of the several states, and some by the national congress, in an attempt to properly regulate the liquor traffic—none of which have met with great success—and we cannot say that the instant law calling for strict price control and the elimination of ruinous competition has no relation to the subject or that it is arbitrary and discriminatory and not based upon substantial grounds."

Many other states have enforced price-fixing laws of one kind or another, but most of these are irrelevant here, nor do we now approve them either by inference or otherwise. It is established that such enactments do not violate the due process, equal protection, privileges and immunities, or other possibly relevant clauses in the Federal Constitution. *Nebbia* v. *New York,* 291 U. S. 502, 54 S. Ct. 505, 79 L. Ed. 940, 89 A. L. R. 1469; *Olsen* v. *Nebraska,* 313 U. S. 236, 61 S. Ct. 862, 85 L. Ed. 1305, 133 A. L. R. 1500, therefore it is clear that the Arkansas liquor price control act is not violative of the Federal Constitution. Decisions enforcing price controls over

liquor and beer sales in still other states do not deal with the constitutional questions which we have before us here —see *Grant Lunch Corp.* v. *Driscoll,* 129 N. J. L. 408, 29 Atl. 2d 888; *Fowler* v. *Harris,* 174 Md. 398, 200 Atl. 825— though they do, of course, imply an absence of the constitutional doubts which invoked the present litigation.

The principal argument in Arkansas, as in Kentucky, against the constitutionality of the liquor price control act is that it confers a "special privilege" of profit making upon liquor dealers, a privilege not conferred upon the rest of the population. This is of course true in one sense only—the statute does assure a gross profit per item sold, but it does not assure a net profit in the operation of any particular store. That however is beside the point; there can be no doubt that the statute substantially increases the likelihood of net profit to the dealer.

The fact remains that from the earliest days of liquor regulation our laws, now admittedly valid, have granted a special privilege to liquor dealers much more farreaching, more monopolistic, than anything contained in Act 282. This is the license to engage in the liquor business to the exclusion of unlicensed sellers. This is a "special privilege" of which bootleggers have traditionally complained, and one which gives to liquor dealers a substantial assurance of the profit that is not given to other law-abiding citizens. Yet the courts of Arkansas, like those of all American states, have sustained these monopolistic grants of special privilege on the ground that it is within the competency of the legislature to determine under the police power what regulatory rules are needful in controlling a type of business fraught with perils to public peace, health and safety as is the liquor business.

The recital of legislative policy in section 1 of Act 282 asserts the purpose "of avoiding price wars which would materially affect the revenues of the State, attempts at monopolies, and the demoralization of the legally controlled sale of liquors in this State which grows out of unfair price manipulation." The effect upon State revenues is one of the least of the harms which

would flow from an unregulated liquor traffic. Unlawful sales to minors and drunkards, the offering of free samples, the effort to increase sales by cut-rate prices and other competitive practices freely allowed and commonly encouraged in other and more harmless fields of commerce, are among the evils against which our legislation seeks to guard.

For a century or more we have sought to deal with such dangers by the grant of special privileges to liquor sellers as a class, on the assumption that the limited number of grantees of the special privilege could be more easily regulated than could unlicensed sellers generally. In the course of the century our legislatures have devised many regulations for the liquor trade. Some of them have been abandoned, others are retained today. Some of our regulations have been opposed by a majority of liquor dealers because the rules were onerous and burdensome, other regulations have pleased the dealers because they served to do away with costly competitive practices, to eliminate untaxed bootleg sales, to forbid business methods which aroused public antagonism, or to impose other limitations or procedures which proved financially profitable to law-abiding dealers. The validity of these legislative regulations is not to be tested by whether they produce more or less profit to the liquor dealers, or by whether the regulations are pleasing or displeasing to the regulated dealers. Rather, the legislative judgment is the test.

There is much room for difference of opinion as to whether the fixing of minimum prices is a sound or wise method for achieving the legitimate police power ends of liquor traffic regulation. The writer of this opinion and a majority of his colleagues on this Court feel personally that such minimum price fixing is unsound and unwise, but our views on that point are irrelevant here. Others believe that price regulation does tend to remove some of the dangers that inhere in the liquor traffic, and that it gives to the state a firmer control than could otherwise be maintained over the traffic and its incidental evils. That is an understandable point of view,

and one that apparently appealed to the intelligent judgment of members of the legislature. The legislature was seeking a remedy for ills that it is authorized to remedy, or seek to remedy, and its choice of remedy was not one that is prohibited to it by our Constitution.

The decree of the Chancery Court is affirmed.

The CHIEF JUSTICE and McFADDIN, J., dissent in part. DUNAWAY, J., not participating.

ED. F. McFADDIN, Justice (dissenting). This suit attacks the constitutionality of Act 282 of 1949, which Act has three objectives:

(1)—To fix the price of liquor and provide a penalty for sale at a different price (§§ 1 to 12, inclusive, and § 15 attempts to accomplish this objective);

(2)—To levy an additional tax on liquor (§ 13 of Act 282 attempts to accomplish this objective); and

(3)—To authorize the employment of twenty additional enforcement officers at salaries to be paid from the tax levied by § 13 (§§ 14 and 14-A of the Act attempt to accomplish this objective).

There is no real challenge as to the constitutionality of Objective No. 2 (that is, the tax levy), or Objective No. 3 (that is, the employment); and I regard these objectives as clearly constitutional and severable from Objective No. 1. In other words, the tax and employment provisions are constitutional.

This dissent is directed only to so much of Objective No. 1 of the Act as fixes a *minimum* price on liquor and forbids sale at less than such minimum price. I regard such legislation as granting the liquor dealers a privilege in violation of two sections of our Constitution. These are Article II, § 18 of our State Constitution, which says: ''The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens[1]''; and

---

[1] In *Edelmann* v. *The City of Fort Smith*, 194 Ark. 100, 105 S. W. 2d 528, we held that a statute granting tax immunity to World War Veterans was unconstitutional, yet the Act 282 of 1949 guarantees liquor dealers a profit which is not guaranteed to other citizens.

also Article II, § 19 of our State Constitution, which says: ". . . nor shall . . . privileges . . . ever be granted or conferred in this State . . ."

In the early case of *Ex Parte Levy,* 43 Ark. 42, 51 Am. Rep. 550, (also a liquor case), Mr. Justice EAKIN, in considering this constitutional language, said of a privilege:

"It is, according to Burrell, some peculiar right or favor granted by law contrary to the general rule—an exemption or immunity from some general duty or burden—a right peculiar to some individual or body—a personal benefit or favor (see Bur. Law Dic. in verb.)."

To the same effect, see 50 C. J. 400, wherein cases are cited which say that the word "privilege" means:

". . . a peculiar advantage; a peculiar benefit or advantage; a peculiar benefit, favor, or advantage; a personal benefit or favor; a private or personal favor enjoyed; . . . a particular and peculiar benefit or privilege, enjoyed by a person, company, or class beyond the common advantages of other citizens; some peculiar right or favor granted by law contrary to the general rule; . . ."

Bouvier's Law Dictionary says a privilege is: "Exemption from such burdens as others are subjected to."

I make the point that our Constitution prohibits granting one group an advantage not enjoyed by all groups; and I make the point that this Act 282 of 1949—*insofar as it fixes a minimum price for which liquor may be sold*—grants a "peculiar advantage" to liquor dealers, because by such legislation the State is guaranteeing them a gross profit in their business, whereas the State is not guaranteeing such a gross profit to farmers, merchants, barbers, doctors, or any other group in our economic system.

That the Act does guarantee such a gross profit to liquor dealers is definitely stated in §§ 3, 4, 10 and *15 of*

*said Act 282.*[2] *Wholesale liquor dealers are guaranteed* 15 per cent. gross profit and retail liquor dealers are guaranteed from 33⅓ to 50 per cent. gross profit, depending on the type of liquor sold; and anyone attempting to sell at less than the fixed price is subject to prosecution. In short, liquor dealers are guaranteed a gross profit, because the State has the right to issue them permits and the State proposes to keep the liquor industry in a "healthy condition" by prohibiting one dealer from underselling another. What other group is thus favored in our State?

Several years ago the barbers of this State attempted to have their prices fixed; and Act 432 of 1941 was adopted, under which the State Board of Barber Examiners fixed the price of a haircut at forty cents and the price of a shave at twenty cents. Litigation ensued to test this price-fixing law, and it was held unconstitutional in the case of *Noble* v. *Davis*, 204 Ark. 156, 161 S. W. 2d 189. Mr. Justice McHANEY delivered the opinion of this Court in that case and spoke out in clear language against the entire evil of price fixing:

" 'This class of legislation, that is, fixing prices, is new and likely resulted from the decision of the Supreme Court of the United States in *Nebbia* v. *New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469,

---

[2] These sections read:

"Section 3. The wholesaler's selling price to the retailer shall be his cost (as defined in this Act) and determined by the Commissioner of Revenues, plus a mark-up of fifteen (15) per cent of cost on liquor, fifteen (15) per cent on cordials, liqueurs, and specialties, and fifteen (15) per cent on sparkling and still wines, and he shall deliver such liquors to the retailers at such price without additional charge for delivery.

"Section 4. The retailer's selling price shall be his cost (as defined in this Act) and determined by the Commissioner of Revenues, plus a mark-up of thirty-three and one-third (33⅓) per cent of cost on liquor, forty-five (45) per cent on cordials, liqueurs, and specialties, and fifty (50) per cent on sparkling and still wines.

"Section 10. Any rebates, loans, gifts, or other special inducements offered, given or accepted by either wholesaler or retailer shall be considered evasions of the requirements of this Act, . . ."

"Section 15. Any person who violates any of the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than One Hundred ($100.00) Dollars nor more than Five Hundred ($500.00) Dollars and any permit which has been issued to such person so convicted shall be revoked and may not again be issued to such person for a period of two (2) years."

decided March 5, 1934, in which the court sustained a statute fixing the price of milk in New York. A dissenting opinion was filed in that case, concurred in by four members of the court. The various acts fixing prices to be charged by barbers, to which our attention has been directed, were passed since the decision in the Nebbia case.' The following are some of the cases where the courts have held similar legislation invalid, in addition to the Tennessee case: *Duncan* v. *City of Des Moines,* 222 Ia. 218, 268 N. W. 547; *State, ex rel. Fulton* v. *Ives,* 123 Fla. 401, 167 So. 394; *Mobile* v. *Rouse,* 233 Ala. 622, 173 So. 266, 111 A. L. R. 349; *Hollingsworth* v. *State Board of Barber Examiners,* 217 Ind. 373, 28 N. E. 2d 64. The decisions in all these cases are based on the fact that the statutes of those states are not regulatory, but are mere price-fixing statutes, or a delegation of the power to fix prices to a board, which have no real or substantial relation to the public safety, health, welfare or prosperity, and are thus distinguishable from the Nebbia case. In the Tennessee case the further observation is made: 'If the act in question is valid, then the Legislature can directly, or through a board, fix the fees that physicians and dentists may charge for their services; the prices that hotels, restaurants and lunch counters may charge for food; the prices of meats, packing house and canning factory products; and so on *ad finitum* until the liberty of the individual and the right to contract is destroyed.' We agree with the principles announced in this case and the other cases above cited as also others that might be cited."

Thus, regardless of "price fixing" in other States, the fact remains that we declared it unconstitutional in *Noble* v. *Davis, supra.* Although we held that barbers could not fix prices, yet the majority is now allowing liquor dealers to be protected by having their prices fixed. The trade of a barber is an old and respected trade, whereas the liquor dealer business has always been one of a dangerous nature; yet we are guaranteeing a gross profit to liquor dealers, after refusing such a gross profit to barbers. This Act 282 of 1949 singles out one group— the liquor dealers—and guarantees them a privilege that

we have denied to other groups in our economic system. Therefore I submit that it is unconstitutional insofar as it puts a floor on the price of liquor.

It is said that if the State does not put a minimum price on liquor there will be a price war, and the State will lose revenue. This is a fallacious argument. The State will get just as much tax on liquor, whether liquor be sold at a profit or at a loss to the dealer. Have conditions reached the place where the State must prohibit merchants from having sales, for fear some will lose money? The free enterprise system is certainly in great danger if we are afraid to trust a merchant to run his business for fear he may lose money by selling his goods too cheaply. No, this Act, under the guise of protecting the State revenue, is granting a privilege to the liquor dealers which has been rightly refused the barbers in the case cited. The whole idea of guaranteeing a profit— gross or net—to an industry is contrary to our Constitution. The majority seeks to distinguish the price fixing for liquor dealers from price fixing refused the barbers by saying that the liquor business is in a distinct sphere. My answer to such argument is, that the Constitution does not grant the liquor group any privileges refused other groups, and that the Constitution should be the guide.

It is true that in some of our cases we have said that the liquor business existed at the "privilege" of the State. In *Cook, Commissioner* v. *Glazer's Wholesale Drug Co.*, 209 Ark. 189, 189 S. W. 2d 897, in speaking of the liquor permit, this sentence was used: "The privileges conditionally extended with the permit cannot be terminated nor abridged at the whim of an administrator . . ." The word "privileges," as quoted in the sentence, was used as synonymous with *sufferance* or *permission*. In other words, the cases in which we have spoken of the liquor business as operating at the privilege of the State, the word *"privilege"* was meant as engaging in a business that was not a matter of right but a matter of being permitted by the State. This is clearly reflected by the language of Mr. Justice EAKIN in *Ex Parte Levy*, 43 Ark. 42:

"There are some trades and occupations confessedly dangerous to the public, either as to health, or safety, or morals. Government has the inherent power to regulate or prohibit them. It is not presumed that constitutions meant to prohibit this salutary exercise of power. The retail of liquors is one of them. As lawful as any other, when permitted, and as fully entitled to protection, it is nevertheless in questions of giving or withholding permission, considered as dangerous."

The majority is allowing a business, which operates only by permission, to now acquire a special privilege in violation of our Constitution. The Kentucky case of *Reeves* v. *Simon,* 289 Ky. 793, 160 S. W. 2d 149, does not seem to me to be sufficient justification for the evasion of our Constitutional inhibitions, as contained in Article II, §§ 18 and 19 and previously quoted. I respectfully submit that neither the Kentucky case nor the majority opinion in the case at bar has answered the argument which points out that the Constitution of our State prohibits the granting of a privilege. That Act 282 of 1949 does grant such a privilege is clear, because it puts a minimum price on the sale of liquor.

That the State has a right to put a maximum price on liquor is clear, because the liquor business is of such a nature that it must be regulated; and those who engage in it must get their permits from the State on such terms as the State desires to impose, and one of these conditions is that those engaged in the business must not sell above a certain price. So the maximum price on liquor is constitutional. But the putting of a floor on the price of the article and prohibiting anyone from selling liquor at less than a fixed price is unconstitutional, because the effect of such legislation is to guarantee a profit to liquor dealers and to give them a privilege in violation of our Constitution.

Therefore, for the reasons herein stated, I respectfully dissent from that portion of the majority opinion which holds to be constitutional the section of Act 282 of 1949 which fixed a minimum price on the sale of liquor. I am authorized to say that the Chief Justice has read

this dissenting opinion and concurs with the views herein stated and may later issue an additional dissenting opinion of his own.