UNION CARBIDE AND CARBON CORPORATION *v.*
WHITE RIVER DISTRIBUTORS, INC.

5-553                                    275 S. W. 2d 455

Opinion delivered February 7, 1955.

*Eichenbaum, Walther, Scott & Miller,* for appellant.

*W. D. Murphy, Jr.,* and *Wright, Harrison, Lindsey & Upton,* for appellee.

WARD, J. This appeal seeks to sustain the constitutionality of Act 92 of 1937 commonly known as the "Arkansas Fair Trade Act", which is found in Ark. Stats. § 70-201 through § 70-208.

Appellant, a corporation, manufactures an antifreeze product which it sells under the trade name of "Prestone". Under the Act it contends it has the right to require all retailers in Arkansas to sell Prestone to

consumers at the price of $3.75 per gallon. Appellee, a corporation operating a retail store in Batesville, advertised and sold Prestone for $2.97 per gallon. Appellant filed suit in Chancery Court, under the provisions of § 6 of the Act, to restrain appellee, and the Court refused to enjoin on the ground that the Act violates §§ 2, 8, 18, 19 and 29, Article 2 of the Arkansas Constitution.

*The scope of our investigation* has been restricted by agreement of the parties and by the conclusion we hereafter reach, all as presently stated.

No Federal constitutional question is involved, and all pertinent facts are stipulated. Appellee contends that said Act, since its adoption, was rendered void because similar Acts have been held in conflict with the Sherman Anti-Trust Act, and that to be effective the Act would have to be re-enacted. We have chosen to place our decision on other grounds and therefore pretermit this question.

The question presented for our determination can also be further limited in three respects.

(a) Disregarding § 6 of Act 92, there is no contention here by appellee that appellant does not have the right, under the Act, to fix the price at which Prestone must be sold to the public provided it does so by written agreements with the retailers, either direct or through its wholesaler. Section 6 of the Act however is designed to bind appellee to sell at the price fixed by appellant even though it [the retailer] signed no agreement and even though it lawfully held title to and was lawfully in possession of a quantity of Prestone. So hereafter when we speak of the effect or validity of the "Act" we will refer particularly to Section 6. We make no finding as to the constitutionality of the remainder of the Act if § 6 is deleted. It is necessary to explain that appellant did have a contract with one retailer in Arkansas to sell at $3.75 per gallon, and that under the terms of the Act this binds every other retailer in Arkansas [including appellee] to sell at the same price.

560

(b) While the trial court, in holding the Act unconstitutional, stated it violated §§ 2, 8, 18, 19, and 29 of Article 2 of the Arkansas Constitution, the burden of our consideration will relate to § 8 which says that **no one shall be deprived** of his *property* without due process of law, and in doing so we do not intend to intimate that the other sections are not relevant to the issue here.

(c) We also eliminate any consideration of justification of the Act on the ground that it prevents ruinous competition caused by selling below cost, first, because we do not conceive that to be the purpose of the Act and, secondly, because it is stipulated that appellee made a profit by selling at $2.97 per gallon.

*It is stipulated that*: (a) Prestone, bearing the Trade-Mark, is and has been in fair and open competition in this state with products of the same general class produced and distributed by others [a requirement of the Act]; (b) Appellant, through its distributor, on or about September 17, 1952 entered into a written agreement with a selected retail dealer in this state whereby said retailer agreed not to sell Prestone to the public at less than the price agreed on, which price was $3.75 per gallon; (c) Since September 17, 1952 appellee has advertised for sale and has sold at retail Prestone for less than the fixed price, and unless restrained will continue to do so; (d) At all times pertinent hereto appellee had notice of the existence of the aforesaid agreement and of the retail price mentioned therein [as required by the Act]; (e) All of the said sales of Prestone made by appellee were at a profit; (f) There are other retail dealers in the Batesville area who sell Prestone at the fixed price but they have threatened to discontinue handling Prestone and switch to other brands unless appellee is stopped from selling at the reduced price. If such dealers should so discontinue handling Prestone appellant would lose a substantial amount of business. Likewise, if appellee is not restrained, other retail dealers throughout the state may switch to other brands, resulting in appellant's price structure in Arkansas and

its rights under the Arkansas Fair Trade Act being jeopardized; (g) The right of appellee, if such right exists, to sell Prestone at the reduced price is a *valuable property right,* and; (h) Appellee has not signed any Fair Trade Agreement with appellant or with any of the latter's agents or distributors.

*The issue.* Under the above statement the one pivotal issue to be considered is, as we view it, *whether the Act [including, of course, § 6 thereof] constitutes an abuse of the police power of the Arkansas Legislature.* The question is thus stated for these reasons:

(a) The right of appellee to sell its own property at a price agreeable to it is a right guaranteed by the Constitution since it is a valuable property right. That such right to sell is a valuable property right cannot be denied. First, appellant has stipulated that it "is a valuable property right." Secondly, our courts have recognized this to be a fact. In *Coppage* v. *Kansas,* 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, the court said: "Included in the right of personal liberty and the right of private property . . . . is the right to make contracts for the acquisition of property. . . . . If this right be struck down or arbitrarily interfered with there is a substantial impairment of liberty in the long established constitutional sense."

(b) Since the "valuable property right" belonging to appellee is guaranteed by the constitution and has not been contracted away, it is axiomatic, or it is at least not questioned by appellant, that the legislature has no right by an enactment to take it away unless it has the right by virtue of its inherent police power, and then only to protect the public welfare. This principle is so well established by our courts that citations would appear useless. It is recognized in most if not all of the decisions both upholding and denying the constitutionality of Fair Trade Acts, some of which will be mentioned later. It was the basis of our own decision in *Noble* v. *Davis,* 204 Ark. 156, 161 S. W. 2d 189, which will be discussed hereafter. Consequently our specific task is to determine if it can reasonably be said that

said Act 92, in effect, promotes the general welfare. But before we attempt to reach a conclusion on this specific point it will be helpful to understand just what the Act really does or accomplishes.

*What the Act does.* Considering the Act in relation to this particular case, it virtually gives appellant the absolute right to fix the price at which Prestone must be sold to the consuming public in Arkansas without regard to the cost of manufacture or distribution. We are not forgetting that it must first contract with one retailer in the state and appellee must have knowledge of contract and the fixed price, but these provisions consist more of form than substance and merely indicate a desperate attempt to hedge against the charge of unconstitutionality. Nobody doubts the feasibility of appellant acquiring one contract dealer out of the hundreds of retail dealers in the state, or the feasibility of bringing this information to all other dealers. If securing a contract with one dealer binds all others, then the corollary would be that, absent such contract, the others are not bound. It is frightful to think a device so easily concocted could destroy the constitutional bulwark protecting our personal liberties and the public welfare.

Considerable discussion in opinions supporting similar Fair Trade Acts has been devoted to distinguishing vertical from horizontal price fixing, concluding that the Act deals only with the former and that it is not objectional. Without evaluating the merit or relevancy of such discussions, it suffices at this time to reassert that the Act does permit price fixing to the extent heretofore mentioned.

*Public Welfare.* There are several considered matters which impel us to conclude that the effect of the Act is not to protect the public welfare and therefore violates our Constitution.

(a) Full and free competition is the long recognized basis of our economy. Trade-marked articles comprise a large number of the commodities in common use

today and it is common knowledge that the number is increasing. There is nothing in the Act to limit the extent of increase. We can think of no way in which the public welfare was being jeopardized under the system of free competition prior to 1937 which suggested the necessity or advisability of imposing the restrictions contained in Act 92, and we can think of none that exists today. To the contrary, we believe it is generally recognized that the interest of the public is best served by the opportunity to buy commodities in a freely competitive market. We recognize that competition is preserved to a degree under the provisions of the Act, but it must be admitted that it is also restricted to a degree. The Act can be sustained only if it enhances the general welfare and not if it restricts it to only a small extent.

We are not unmindful of the fact that a trade-mark has value which is entitled to protection, as is recognized in many cases cited by appellant. The answer to this contention is that appellant's trade-mark had ample protection prior to the enactment of any Fair Trade Act, and Act 92 gives it additional protection [by contract] even though § 6 be deleted. Appellant has no right to expect additional protection if it is at the expense of the general welfare.

(b) *History of the Act.* The history of the promulgation of Fair Trade Acts justifies the inference they were thought to benefit a few manufacturers and not the general public. Nowhere has our attention been called to any demand by the public for the enactment of such legislation. On the contrary it appears that special groups have been active in its support.

Our attention has been directed to Report No. 1292, House of Representatives, 82nd Congress, 2nd Session, in which, among other things, it was said:

"By far the most enthusiastic advocate of fair trade legislation is the retail druggist and the most active group in his association, the National Association of Retail Druggists. For over half a century this Asso-

ciation has been fighting for fair trade. Almost single handed it secured the adoption of the Miller-Tydings Act and most state laws . . .

Very few manufacturers other than those in the drug, cosmetic and toilet goods industries either individually or through their associations have publicly urged price maintenance legislation upon Congress in recent years . . . There is also a noticeable lack of representatives of the general public in support of fair trade. No general labor or farm group has appeared, at least in recent years, in favor of fair trade.''

Likewise we find in *The Report of the Federal Trade Commission on Resale Price Maintenance,* it was stated in 1945, that:

''Minimum resale price maintenance was originally advocated by manufacturers of highly individualized, trademarked, trade-named, or branded products as a means of protecting them from unrestrained price cutting among dealers to whom the products were sold outright. When finally enacted by the states, and by the Congress, however, its enactment was urged almost entirely by a few well organized dealer groups as a means of eliminating price competition both of dealers using the same method of distribution and of dealers using new and different methods of distribution.''

(c). *Our Own Decisions.* Although this is the first time Act 92 has been before this court for interpretation relative to constitutionality, yet the course we should take here is clearly indicated by our former decisions on closely related issues.

We call attention to *Beaty* v. *Humphrey, State Auditor,* 195 Ark. 1008, 115 S. W. 2d 559, not because of the final conclusion there reached but because the reasoning there used is significant and because it throws light on a later decision which will be emphasized. In the *Beaty* case this court held constitutional Act 313 of 1937 which regulated the practice of barbering by prescribing a method of examining, licensing, and training barbers and maintaining sanitary conditions, prescrib-

ing certain fees but not fixing prices for services rendered. It was said that if the legislature had any right to pass the Act "it comes within the police power of the State." It was then said, by adopting language from another decision, "Therefore, we are confronted with the question of whether the regulation of the occupation of barbers is necessary to the public health." It was then concluded that the Act was proper for the protection of the public and, consequently, a proper exercise of the police power, but not without this warning: "The police power of the state is one founded in public necessity and this necessity must exist in order to justify its exercise." The opinion was written by Justice McHaney.

Just four years later Justice McHaney wrote the decision in *Noble* v. *Davis, supra.* This time the court was called on to consider the constitutionality of Act 432 of 1941 which fixed the charges to be made by barbers for their services. In holding Act 432 unconstitutional the court employed language and reasoning applicable to the matter here under consideration.

Act 432, like Act 92, declared its purpose to be "the protection of the public safety, health, welfare and general prosperity . . .", but the court said this "is the declaration of a non-existing fact." It was stated that barbering was a profession of common right although subject to regulation under the police power, but that there is no justification of a regulatory statute "except as they relate to the public and are for its benefit." After mentioning that the real purpose of Act 432 was to fix minimum prices and regulate hours of work, the court said:

"Now just what connection these three purposes have with the 'protection of the public safety, health, welfare and general prosperity,' or with either of them, is difficult to perceive. How can the price a barber charges for a haircut or shave, or the commission the owner pays the barbers, or the hour the shop opens or closes affect the public safety, health, welfare or prosperity? Such connection is visionary and not real."

The underlying principle upon which the court rested its decision, and which we think controls the matter under consideration here, is well stated in the following language which the court adopted from Am. Jur.:

"The mere assertion by the Legislature that a statute relates to the public health, safety, or welfare does not in itself bring that statute within the police power of a state, for there must always be an obvious and real connection between the actual provisions of the police regulations and its avowed purpose and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. A statute or ordinance which has no real, substantial, or rational relation to the public safety, health, moral, or general welfare is a palpable invasion of rights secured by fundamental law and cannot be sustained as a legitimate exercise of the police power. One application of the familiar rule that the validity of an act is to be determined by its practical operation and effect, and not by its title or declared purpose, is that a constitutional right cannot be abridged by legislation under the guise of police regulations. The exercise of the power must have a substantial basis and cannot be made a mere pretext for legislation that does not fall within it. The Legislature has no power, under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights."

(d) *Supporting Decisions from Other States.* Fair Trade Acts, like our Act, have been held unconstitutional in Florida, Michigan, and Georgia. We shall examine these decisions in the order named.

*Florida* was the first state to hold a Fair Trade unconstitutional, in *Liquor Stores, Inc., et al.* v. *Continental Distilling Corp.,* 40 So. 2d 371, decided in 1949. Perhaps the gist of the reasons given for the court's conclusion is couched in its own words: "Constitutional

law never sanctions the granting of sovereign power to one group of citizens to be exercised against another group unless the *general welfare* [the court's own emphasis] is served." The court, after acknowledging the property right which a manufacturer has in a trademark and that it should be and is protected as other property rights, said: "If he may claim additional advantages, then he must look to the law emanating from the police power. If the advantage is personal as distinguished from the *general public* then the police power may not be invoked." In commenting upon other decisions which uphold the Act, the court states that many of them rested on "the proponent's statement that the general welfare would be served," and then quoted language from a report of Federal Trade Commission which, in the court's opinion, proved just the opposite.

*Michigan* was next to strike down a Fair Trade Act in 1952, in the case of *Shakespeare* v. *Lippman's Tool Shop Sporting Goods Co.,* 334 Mich. 109, 54 N. W. 2d 268. The court there specifically approved the reasoning in the *Florida* case, *supra,* holding the Act could not be sustained under the police power of the state, that it violated the due process clause, and that it bore no reasonable relation to the general welfare. The court took note of the fact that most of the states considering the same Act had upheld its constitutionality, but said that it considered the better reasoned view was that of the Florida Supreme Court.

*Georgia.* Perhaps the most thorough consideration that has been given to this kind of an Act by any court has been that given by the Supreme Court of Georgia which has twice held such Act unconstitutional. In the first case, *Grayson-Robinson Stores, Inc.* v. *Oneida, Limited,* 209 Ga. 613, 75 S. E. 2d 161, decided in 1953, the court struck down the Act merely by referring to its reasoning in a former decision and stating that the Act offends that part of the constitution which provides, " 'No person shall be deprived of life, liberty, or property except by due process of law'."

It being thought perhaps by the proponents of Fair Trade Acts that the Supreme Court of Georgia had

not given due consideration to the question or that the declaration mentioned above was *obiter dictum*, the same question was again presented to the court in the case of *Cox, et al. v. General Electric Company*, 211 Ga. 286, 85 S. E. 2d 514, in which a decision was released January 10, 1955 and which is final at this time. We emphasize this case because it expresses our view in regard to certain arguments which have been advanced in many of the decisions relied on by the appellant in this case, such as: The declared purpose of the Act to promote the general welfare; The property right adhering to the trade-mark, and; The prerogative of this court to be the final arbiter. Among other things the court said: ''What the courts of other states have decided is not controlling, and this is one of the few powers left to states to decide for themselves regardless of what the Supreme Court of the United States may or may not have decided.'' The last two sentences express our view regarding the relation of Act 92 to our own Constitution. They read:

''The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trade-mark to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due process clause of the Constitution of the State of Georgia.''

We also agree with a statement, not original with us, to the effect that: It is a generalization, but not an overstatement, to say that the effort to ''fix prices'' is made by groups who desire to sell something for more than the sponsoring group believes that the purchasing public would pay for that ''something'' without an enforced fixed price. It would seem apparent that the principal objective of minimum price maintenance is the protection of profit margins for retailers and distributors unable or unwilling to meet the pressure of competition.

*Decisions upholding Constitutionality.* It would not seem proper to close this opinion without specifically recognizing that there are many more decisions upholding the Act than there are rejecting it, and we do not want to leave the impression that we are not reluctant to differ with such impressive authority. The highest courts in seventeen states have concluded Fair Trade Acts, containing sections like § 6 of our Act, constitutional. Most of the decisions are listed in the *Shakespeare* case, *supra.* We can only say that we have carefully considered each of these decisions and remain unconvinced. These decisions certainly contain such merit as to justify more thorough comment than we are justified in making due to the length of this opinion.

Finding no error, the decree of the trial court is affirmed.

Justices McFADDIN and GEORGE ROSE SMITH concur.

ED. F. McFADDIN, Justice, concurring. The majority limits the effect of its holding to § 6 of the Arkansas Fair Trade Act (Act 92 of 1937). That section is referred to as the "non-signer" section. I agree with what the majority has said about the invalidity of § 6 of the Act; but I go further and say the entire Act 92 of 1937 is unconstitutional, under the authority of our own case of *Noble* v. *Davis,* 204 Ark. 156, 161 S. W. 2d 189. In that case we were considering Act 432 of 1941, which authorized the State Board of Barber Examiners to fix the minimum price for barber services throughout the State. We held that Act to be unconstitutional, because it was a *price fixing* Act and violative of the Constitution.

If the State Board of Barber Examiners cannot fix the minimum price of a haircut or a shave, then I cannot see how, by any stretch of the imagination, the Union Carbide Company should be allowed, by contract, to fix the price for which Prestone may be sold by its contract dealers in the State of Arkansas. So I think that *Noble* v. *Davis* disposes of the entire Act here at issue.

In *Gipson* v. *Morley,* 217 Ark. 560, 233 S. W. 2d 79, the majority of this Court upheld Act 282 of 1949, which

allowed for fixing the price for which liquor might be sold. I dissented in that case, because I have all the time maintained that price-fixing—whether on liquor, Prestone, shaves, haircuts, or any other article, service, or commodity—is violative of the Constitution. I anticipate that some day the holding in *Gipson* v. *Morley* will be overruled, and the holding in *Noble* v. *Davis* will be treated as our fundamental policy. The trend of decisions is in that direction.