CENTRAL ARK. MILK PROD. ASSOC. *v*. CONSUMER'S
WAREHOUSE MARKET, INC. ET AL.

5-1723                                                  319 S. W. 2d 511

Opinion delivered January 12, 1959.

*Bryan & Fitzhugh,* for appellant.

*Hardin, Barton, Hardin & Garner, Bethel & Pearce & Lawson Cloninger, Heilbron & Shaw, Owens, Mc-Haney, Lofton & McHaney,* for appellee.

PAUL WARD, Associate Justice. This litigation questions the application of Act 380 of the 1955 General Assembly (Ark. Stats. § 70-701-707) which deals with the price to be charged for milk. Appellant is the Central Arkansas Milk Producers Association, Incorporated, hereafter referred to as CAMPA, which was created by Act 153 of 1939 (Ark. Stats. § 77-1001-1025). Members of CAMPA are dairy farmers who sell raw milk to processors who, in turn, sell the processed milk to retail grocery stores at wholesale for resale, at retail prices, to ultimate consumers. Appellees are some 6 or 8 retail grocery stores located in Fort Smith.

CAMPA petitioned the Sebastian Chancery Court to enjoin each of the appellees from selling milk at retail at any price below what the milk cost it plus 4%, thereby seeking to invoke the provisions of said Act 380.

In response to said petition appellees entered demurrers which were sustained by the Chancellor on the ground (a) that said Act 380 does not apply to the sale of milk by retail grocery stores, and (b) that said Act was unconstitutional.

Plaintiff, electing not to plead further, prosecutes this appeal.

The prohibition is directed against persons engaged in *processing* and *distributing* milk. The decisive question is: Is a retail grocery store engaged in *distributing* milk within the meaning of the Act?

(a) A careful analysis of the language used in said Act 380 impels us to agree with the Chancellor's holding that it does not apply to retail grocery stores. There

are several provisions in the Act that cannot be reconciled with any other view. *First.* Section 1 of the Act contains this language: "However, it is the intention of this Act to prevent any person, firm or corporation engaged in the business of processing and/or *distributing* milk from lowering its selling price below cost, as herein defined, plus four (4%) per centum, except as hereinafter stated." It is obvious that the retail grocery stores do not *process* milk and we do not think they *distribute* milk in the sense that the word is used in the Act, as we will attempt to show later. *Second.* Section 2 defines the term "Equivalent competitive prices" as "any legal wholesale or retail price, not less than the minimum prices provided herein, at which fresh fluid milk is sold, advertised, or offered for sale by a competitor who sells not less than *five* (5%) *per centum* of the total fresh fluid milk sales in that county" (our emphasis). This clause makes sense only when applying it to the relatively few *processors* or *distributors* which would ordinarily be found in any county, but it makes no sense if applied to grocery stores in many counties, such as Sebastian County. It seems unlikely that any one grocery store would ever sell more than 5% of all the milk sold in the county. *Third.* The Act purports to prohibit the sale of milk for less than cost plus 4%. Section 3 defines the word *cost* to "include the price the processor or distributor pays the producer . . ." We believe it is common knowledge that in most instances the *producer* does not sell directly to the grocery store, but to some "middle man" such as a *processor* or *distributor.* By this we are persuaded to believe that the framers of Act 380 did not mean for the word *distributor* to include a grocery store. *Fourth.* In addition to the above, Section 3 sets out the method of arriving at what constitutes *cost.* It seems clear to us that this method might reasonably apply to a *processor* and also to a *distributor* if the latter refers to a wholesaler of milk as we think it does, but we fail to see how it could reasonably apply to a *distributor* if that word was meant to include a retail grocery store. Here are

some of the items of cost that are included: Labor, rent, interest, depreciation, selling costs, maintenance of equipment (and we know of no special equipment needed by a grocery store in order to sell milk), salaries of officers and executives, transportation, credit losses, all types of permit and license fees, all taxes, insurance, advertising, and all overhead expenses of doing business. Bearing in mind that a retail grocery store sells several hundred different items in addition to milk, we cannot believe the legislature meant for the owner of a retail grocery store to allocate the right proportion of the various expense items to the sale of milk. *Fifth.* In addition to the foregoing, Section 4 contains many provisions relating to a determination of *cost* that could not reasonably be meant to apply to a retail grocery store. Some of these are the allowance of rebates, commissions, discounts, extending certain privileges to certain customers, furnishing free equipment, etc.

Reading Act 380 as a whole and particularly because of many of its provisions as set forth above, we are driven to the conclusion that it was not meant to apply to the sale of milk by retail grocery stores, and consequently does not mean for the word *distributor* to include such stores.

It is generally recognized in the milk industry as it is now developed that *distributors* often buy milk from processors and then sell it at wholesale to the grocery stores or deliver it in trucks to the consumer. Thus, a *distributor* is engaged in a separate and distinct business from that of a retail grocery store.

Appellant attaches much significance to language in section 2 where the Act is made applicable to anyone engaged in the "business of processing and/or distributing fresh milk, either at *retail* or wholesale." (our emphasis) However we can see no inconsistency between that language and the view which we have taken. In fact, even under our interpretation, it still could be the purpose of the Act to keep a processor from sell-

ing below cost plus 4% to the consuming public, hence the use of the necessary language.

(b) The question of the constitutionality of Act 380 has been raised and discussed by both sides, but the conclusion which we have heretofore announced makes it unnecessary for us to render any opinion on it.

We have consistently refrained from deciding constitutional questions unless it was necessary to do so. See: *Porter* v. *Waterman*, 77 Ark. 383, 91 S. W. 754 and *Com. of Labor, C. R. Thornbrough* v. *Danco Construction Co.*, 226 Ark. 797, 294 S. W. 2d 336.

The decree of the trial court is therefore affirmed.

Justice JOHNSON not participating.

Justices McFADDIN and ROBINSON concur.

ED. F. McFADDIN, Associate Justice, concurring. I agree with the result reached by the majority; but I think it would have been much simpler to have declared the Act No. 380 of 1955 to be unconstitutional, and that such result would have saved all the wording about "producers," "processors," or "distributors."

In my concurring opinion in *Union Carbide* v. *White River Distributors*, 224 Ark. 558, 275 S. W. 2d 455, I said I considered the entire Act No. 92 of 1937 (the "Arkansas Fair Trade Act") to be unconstitutional under the authority of our own case of *Noble* v. *Davis*, 204 Ark. 156, 161 S. W. 2d 189. By the same token, I consider the entire Act No. 380 of 1955 to be unconstitutional; and to me it seems easier to so state, and save all persons any thought that by getting the Legislature to revamp price-fixing acts, the Court may ultimately hold them constitutional. *Noble* v. *Davis*, *supra*, settles that point.