Ferd HAND *v.* H & R BLOCK, INC.

75-89 528 S.W. 2d 916

Opinion delivered November 3, 1975

*Wootton, Land & Matthews,* for appellant.

*Rose, Nash, Williamson, Carroll & Clay,* for appellee.

J. Fred Jones, Justice. This is an appeal by Ferd Hand from a declaratory judgment holding that Ark. Stat. Ann. § 70-802 (Supp. 1973) did not apply to a franchise existing between Hand and the appellee H & R Block, Inc. and, consequently, it was not necessary to pass on the constitutionality of § 70-802. The appellant urges three points on which he relies for reversal designated as follows:

> "The lower court erred in holding section 70-802 inapplicable to the subject franchise agreement because the plain meaning of the language of the statute requires it to apply to the subject franchise agreement.
>
> The lower court erred in holding section 70-802 inapplicable to the subject franchise agreement because a construction of the statute in light of the legislative intent requires it to apply to the subject franchise agreement.
>
> The lower court erred in holding section 70-802 inapplicable to the subject franchise agreement because such construction circumvents the social benefit sought to be achieved by the statute."

The facts in this case appear as follows: On August 13, 1969, H & R Block, Inc. entered into a franchise agreement with a Mr. Whitaker of Fort Smith, Arkansas, whereby H & R Block granted to Whitaker a franchise to use the service mark and trade name "H & R Block" in Paris, Arkansas, for a period of five years in connection with Whitaker's business of preparing income tax returns for the general public. This franchise agreement was for a period of five years with option to renew. On August 13, 1970, with the

consent of H & R Block, Whitaker assigned his rights under the franchise agreement to the appellant Ferd Hand and one Jim Randall. In 1971 the Arkansas General Assembly enacted Act 252 which made it unlawful for a franchisor to charge an Arkansas franchisee a royalty fee greater than the lowest royalty fee charged franchisees in other states. In 1973 the General Assembly amended § 2 of the 1971 Act with the pertinent provision of the Act, as amended, (Ark. Stat. Ann. § 70-802 [Supp. 1973]) reading as follows:

"After the effective date [January 30, 1973] of this Act, in granting a new franchise for use of a service mark, trade mark or trade name in Arkansas, it shall be unlawful for a franchisor to charge a franchisee a royalty fee which is greater than that which the franchisor customarily charges other franchisees in the United States for similar new franchises granted contemporaneously."

On September 21, 1973, H & R Block entered into a separate agreement designated "Major Franchise Agreement" with James W. Randall and the appellant Ferd Hand, whereby Hand and Randall were given the exclusive right in the same Paris, Arkansas, area formerly awarded to Whitaker, to use the name "H & R Block" and the service marks "The Income Tax People," "America's Largest Tax Service," "Executive Tax Service," "Nation's Largest Tax Service" and any other name or service marks that may be adopted by Block or registered by Block.

On September 31, 1974, H & R Block filed its complaint praying a declaratory judgment under Ark. Stat. Ann. §§ 34-2501 — 34-2512 (Repl. 1962) to obtain a declaration of the rights and "other legal relations" including a declaratory judgment as to the constitutionality of § 2 of Act 252 of the 1971 General Assembly as amended by Act 21 of 1973, § 70-802, *supra*. The prayer of the complaint was as follows:

"[P]laintiff respectfully prays for a judgment declaring that Section 2 of Act 252 of the 1971 Arkansas General Assembly, as amended, does not apply to the agreement dated September 21, 1973 (Exhibit 3), or in the alternative declaring Section 2 of Act 252 of the 1971 Arkan-

sas General Assembly, as amended, to be unconstitutional. . . ."

The judgment of the trial court recites in part as follows:

"6.   the relationship existing between the plaintiff, as franchisor, and the defendant and James W. Randall, as franchisees, under the agreement dated August 13, 1969, and the assignment dated August 13, 1970, did not become a 'new franchise' by virtue of the agreement dated September 21, 1973 (Exhibit 3 to the Complaint), within the meaning of the term 'new franchise' in § 70-802;

7.   the acts of the plaintiff in executing and entering into the agreement dated September 21, 1973 (Exhibit 3 to the Complaint), did not constitute 'granting a new franchise' within the meaning of the terms 'granting a new franchise' in § 70-802 of 1973;

9.   this Court does not imply the assignments will always be treated as this assignment has been treated, however, restricted to the facts of this case, Section 70-802 does not apply to the franchise set forth and described in the agreement dated September 21, 1973 (Exhibit 3 to the Complaint), as the Court construes it as being an amendment or modification of an existing franchise involving substantially the same parties and the same territory, with no additional fee being charged.

10. Inasmuch as the Court has found and concluded that § 70-802 does not apply to the franchise existing between the parties, it is not necessary to determine the constitutionality of § 70-802.

In accordance with the foregoing findings of fact and conclusions of law IT IS THEREFORE ORDERED, ADJUDGED AND DECLARED that Act 21 of 1973 (Ark. Stats. Ann. § 70-802 [Supp. 1973]) does not apply to the franchise between the parties which is set forth and described in the agreement dated September 21, 1973, (Exhibit 3 to the Complaint)."

Block successfully argued before the trial court, and unsuccessfully argues here, that the so-called "Major Franchise Agreement" between Block and the appellant dated September 21, 1973, was only an extension of the franchise to Whitaker dated August 13, 1969, and subsequently transferred to the appellant Hand. It is agreed that the agreement entered into on September 21, 1973, was in violation of § 2 of Act 252 in that the franchise royalty fee charged was greater than the lowest royalty fee charged in other states; but, Block argues that since the "Major Franchise Agreement" of September 21, 1973, was only an extension of the August 13, 1969, franchise agreement, neither agreement was affected by the subsequent amendment to the Act which became effective January 30, 1973. The trial court agreed with the appellee Block on this point but we do not.

Ark. Stat. Ann. § 70-801 (a) (Supp. 1973) provides as follows:

" 'Franchise' shall mean every aspect of the relationship created between a franchisor and franchisee by an oral or written agreement or understanding or series of agreements, understandings, or transactions which involve or result in a continuing commercial relationship by which a franchisee is granted or permitted to offer, sell or distribute the goods or commodities manufactured, processed or distributed by the franchisor or to use a service mark, trade mark or trade name owned by the franchisor."

In reaching its decision that the "Major Franchise Agreement" of September 21, 1973, did not constitute the "granting a new franchise" within the meaning of the term "granting a new franchise" in § 70-802, *supra,* the trial court pointed out that the "Major Franchise Agreement" of 1973 involved substantially the same parties and the same territory and that no additional fee was charged. We do not so construe the September, 1973, agreement. The August, 1969, franchise agreement was between Block as franchisor and J. O. Whitaker of Fort Smith, Arkansas, as franchisee. The September 21, 1973, agreement was between Block as franchisor and Ferd Hand and James Randall of 4310 Cen-

tral Avenue, Hot Springs, Arkansas, as franchisees. The "Major Franchise Agreement" contains other pertinent differences including a "Cancellation of Prior Understandings" provision as follows:

> "This Agreement expresses fully the understanding by and between the parties hereto and all prior understandings, or commitments of any kind, oral or written, as to this franchise and any matter covered by this Agreement are hereby superseded and cancelled, with no further liabilities or obligations of the parties with respect thereto except as to any monies due and unpaid between the parties to this Agreement at the time of the execution of this Agreement."

The agreement also contains a "Release of Prior Claims" provision as follows:

> "By executing this Agreement, Franchisee, individually and on behalf of Franchisee's heirs, legal representatives, successors and assigns, and each assignee of this Agreement by accepting assignment of the same, hereby forever releases and discharges Block, its officers, directors, employees, agents and servants, including Block's subsidiary and affiliated corporations, their respective officers, directors, employees, agents and servants, from any and all claims relating to or arising under any franchise agreement or agreements between the parties and executed prior to August 31, 1973, including but not limited to any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the antitrust laws of the United States or of any State."

The appellee attempts to classify a "franchise" as defined in § 70-802 as something more than a contract or agreement and argues in effect that a franchise which once comes into being remains the same franchise regardless of subsequent agreements. We are of the opinion and so hold that the "Major Franchise Agreement" entered into on September 21, 1973, constituted a "new franchise" within the meaning of the statute. This conclusion brings us to the alternative

question presented on this appeal of whether § 2 of Act 252 is unconstitutional and we are of the opinion that it is.

In *Stone* v. *State,* 254 Ark. 1011, 498 S.W. 2d 634 (1973), we announced certain basic principles which must be kept in mind when determining the constitutionality of an Act of the Legislature and we set out those principles as follows:

> "The first of these is that the legislature's power is limited only by the state and federal constitutions. *Rockefeller* v. *Hogue,* 244 Ark. 1029, 429 S.W. 2d 85; *Berry* v. *Gordon,* 237 Ark. 547, 376 S.W. 2d 279; *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S.W. 2d 428; *Gipson* v. *Ingram,* 215 Ark. 812, 223 S.W. 2d 595. The next is that a presumption of constitutionality attends every such act. *Redding* v. *State,* 254 Ark. 317, 493 S.W. 2d 116; *Bush* v. *Martineau,* 174 Ark. 214, 295 S.W. 9. All doubt must be resolved in favor of constitutionality. *Redding* v. *State, supra; Bush* v. *Martineau, supra.* Another principle is that if it is possible for the courts to so construe an act that it will meet the test of constitutionality, they not only may, but should and will, do so. *Davis* v. *Schimmel,* 252 Ark. 1201, 482 S.W. 2d 785; *McLeod* v. *Santa Fe Transportation Co.,* 205 Ark. 225, 168 S.W. 2d 413. Another way of stating this elementary rule is that every reasonable construction must be resorted to in order to save the statute from unconstitutionality. *Bush* v. *Martineau, supra.* See also *Redding* v. *State, supra.*"

The basis for the challenge to the statute, § 70-802, *supra,* is that it effects a deprivation of property rights without due process of law, contrary to the Fourteenth Amendment of the Constitution of the United States. Block argues that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, and, as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments, and cites *Tyson & Brother* v. *Banton,* 273 U.S. 418 (1927), in support of this contention. The *Tyson* case involved a New York statute which attempted to limit the price ticket brokers could charge over and above the price printed on amusement tickets and the Supreme Court did hold in *Tyson* as Block now argues. Ap-

parently, however, the public interest became more pronounced in the sale and distribution of amusement tickets in New York during the intervening years between the *Tyson* decision in 1927 and 1964, because in the 1964 case of *Gold* v. *Dicarlo*, 235 F. Supp. 817 (S.D.N.Y. 1964), *Tyson* was overruled and the court held that a New York statute which set the maximum price for which brokers could sell tickets to amusements was not a denial of property rights without due process, and that decision was affirmed by the United States Supreme Court, 380 U.S. 520 (1965). It was noted in *Gold* v. *Dicarlo* that abuse existed in the resale of tickets and that the public interest required state control.

As a general rule, it is well settled that the state may regulate private property rights or contract rights through a valid exercise of its police power, including the regulation of prices. *Nebbia* v. *New York*, 291 U.S. 502 (1934). In *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962), the United States Supreme Court upheld the validity of an ordinance which regulated a sand and gravel business. In that case, in connection with the police power, the court said:

> "The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard 'reasonableness,' this Court has generally refrained from announcing any specific criteria. The classic statement of the rule in *Lawton* v. *Steele*, 152 U.S. 133, 137 (1894), is still valid today:
>
> 'To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' "

The validity of Block's property rights in its name here involved is not questioned. So the issue, as we see it in the case at bar, is whether § 70-802 is within the valid exercise of police power. Specifically, does the interest of the public require the interference with the franchisor's and the

franchisee's right to contractually set their own price? In *Willys Motors* v. *Northwest Kaiser-Willys*, 142 F. Supp. 469 (D. Minn. 1956), in upholding a state law which prohibited the cancellation of a franchise agreement without just cause, the court said:

> "That the economic interests of a state may justify the exercise of its protective power notwithstanding interference with contracts is a proposition now well established. See *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.*, 335 U.S. at page 531, 69 S. Ct. 251.
>
> There is one important proviso which must be met before legislation which impairs contractual obligations can be upheld; that is, the legislation in question must be enacted for a public, as contrasted with a private, purpose. See *Home Building & Loan Ass'n* v. *Blaisdell*, 290 U.S. 398, 438 S. Ct. 231, 78 L. Ed. 413; *Worthen Co.* v. *Thomas*, 292 U.S. 426, 431, 432, 54 S. Ct. 816, 78 L. Ed. 1344; *Worthen Co. ex rel. Board of Com'rs, etc.* v. *Kavanaugh*, 295 U.S. 56, 60, 55 S. Ct. 555, 79 L. Ed. 1298; *Western States Utilities Co.* v. *City of Waseca*, 242 Minn. 302, 65 N.W. 2d 255; compare *Veix* v. *Sixth Ward Building & Loan Ass'n*, supra, with *Treigle* v. *Acme Homestead Ass'n*, 297 U.S. 189, 56 S. Ct. 408, 80 L. Ed. 575."

In *State* v. *Hurlock*, 185 Ark. 807, 49 S.W. 2d 611 (1932), in upholding the constitutionality of an act requiring the licensing of real estate brokers, this court said:

> "It is true that the police power can only be exercised to suppress, restrain, or regulate the liberty of individual action, when such action is injurious to the public welfare."

In *Ark. State Hwy. Comm'n* v. *Ark. Power & Light Co.*, 231 Ark. 307, 330 S.W. 2d 77 (1959), in forbidding the Highway Commission from requiring the power company to move some of its poles for public use without just compensation, we said:

> "The police power should not be indiscriminately or un-

necessarily used. In *Beaty* v. *Humphrey*, 195 Ark. 1008, 115 S.W. 2d 559, this court said: 'The police power of the State is one founded in public necessity, and this necessity must exist in order to justify its exercise.' "

No case has been cited to us, and our own research has revealed none, wherein the police power of a state has been used to regulate the price to be agreed upon by contracting parties solely for the benefit of one of the parties. In every instance of such regulation under the police powers, it appears justified only because some broad public interest required it. In the landmark case of *Nebbia* v. *New York, supra,* the Supreme Court of the United States for the first time held a state price "fixing" law not in violation of due process. The statute involved in that case established a maximum and minimum price for the retail sale of milk in New York. The court sustained the invocation of the police power because of the significance of the industry to the public health, welfare and interest involved, saying:

> "The production and distribution of milk is a paramount industry of the state, and largely affects the health and prosperity of its people. Dairying yields fully one-half of the total income from all farm products. Dairy farm investment amounts to approximately $1,-000,000,000. Curtailment or destruction of the dairy industry would cause a serious economic loss to the people of the state."

There are many other federal court decisions and decisions from other states, both pro and con, as to the validity of statutes enacted under the police power but they all turn on the particular statute as related to the facts of the particular case, and the extent to which the public interest, peace, health or welfare were involved, was the final deciding factor in all of them.

The valid exercise of police power in price regulation and control has been upheld and approved by this court when a broad public interest is protected. In *Concrete, Inc.* v. *Arkhola Sand & Gravel Co.,* 230 Ark. 315, 322 S.W. 2d 452 (1959), the Arkansas Unfair Practices Act, which made it un-

lawful for one engaged in the distribution of a commodity of general use or consumption to discriminate between different sections, communities or cities or portions thereof, with intent to destroy competition, by selling at a lower rate in one such section than in another, was upheld, and in that case we said:

"The appellee's assumption that this is a price fixing statute is erroneous. *Dunnell* v. *Shelley,* 38 Cal. App. 2d 118, 100 P. 2d 830. The purpose of the Act, as stated in Ark. Stat. § 70-313, is to safeguard against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. We think the means adopted are reasonable and appropriate to promote the purposes mentioned."

Although in *Concrete, Inc, supra,* we cited the purpose of the Act as stated therein, scienter was mentioned in the Act, and the public interest was to prevent monopolies by stifling and eradicating competition by prolonged and ruinous price wars. In the case of *Gipson* v. *Morley, Comm'r of Revenues,* 217 Ark. 560, 233 S.W. 2d 79 (1950), a statute controlling the minimum prices of intoxicating liquors was upheld. In that case Justice Leflar, speaking for the majority, said:

"[T]he courts of Arkansas, like those of all American states, have sustained these monopolistic grants of special privilege on the ground that it is within the competency of the legislature to determine under the police power what regulatory rules are needful in controlling a type of business fraught with perils to public peace, health and safety as is the liquor business."

The purpose of the statute challenged in the case at bar is set out in the emergency clause, Section 8 of the original Act 252 of 1971 as follows:[1]

---

[1]Section 3 of the Act had to do with money collected for advertising and not used for that purpose. The Act contains a severability clause and Section 3 is not challenged or before us on this appeal. We are only concerned with Section 2 as amended.

"It is found by the General Assembly that franchisors as described in the Act for adequate fees, have licensed Arkansas corporations and citizens to use their trade names and formulae; that in some instances the licensing agreements contain provisions requiring such franchisees to pay a greater royalty for the use of a trade name than is charged to franchisees doing business under the same trade name in other states, and that in some instances, franchisors collect advertising fees from franchisees which are not expended for advertising purposes; and that only by the immediate passage of this Act can this situation be remedied. Therefore, an emergency is hereby declared to exist and this Act, being necessary for the preservation of the public peace, health and safety, shall be in full force and effect from and after its passage and approval."

We consider the case at bar more in point with *Noble v. Davis,* 204 Ark. 156, 161 S.W. 2d 189; and *Union Carbide and Carbon Corp.* v. *White River Distributors, Inc.,* 224 Ark. 558, 275 S.W. 2d 455. In *Union Carbide* the manufacturer of Prestone antifreeze attempted to control the price for which it was to be sold in Arkansas under a provision of Act 92 of 1937, the so-called "Arkansas Fair Trade Act." We held the provision unconstitutional as outside the police powers of the state and followed our reasoning in *Noble* v. *Davis, supra.* Consequently, we shall not review the *Union Carbide* decision further since our reasoning in *Noble* v. *Davis* so nearly coincides with our reasoning in the case at bar. In *Noble* the constitutionality of Act 432 of 1941 authorizing the state board of barber examiners to fix a minimum price for barber services was involved. In that case we refused to follow *Nebbia* v. *New York, supra,* and its progeny since the price regulation under Act 432 was outside the police power of the state. We quote at length from *Noble* since it sets out our reasoning in that case and also in the case at bar. In *Noble* we said:

"That portion of § 1 of said Act 432, above quoted, where the Legislature declared that the purpose of the act is the protection of the public health, safety, etc., is the declaration of a non-existent fact. The fact that the Legislature so declared the purpose of the act does not

make it so, if, in fact, the declared purpose has no substantial connection with the real purpose of the act. The real and only purposes of the act were to confer power on appellants to establish (1) minimum price schedules for barbers; (2) minimum commissions to be paid to barbers for their services; and (3) opening and closing hours for barber shops. Now just what connection these three purposes have with the 'protection of the public safety, health, welfare and general prosperity,' or with either of them is difficult to perceive. How can the price a barber charges for a haircut or shave, or the commission the owner pays the barbers, or the hour the shop opens or closes affect the public safety, health, welfare or prosperity? Such connection is visionary and not real. In line with what we have just said, Am. Jur., vol. 11, p. 1077, it is said: 'The mere assertion by the Legislature that a statute relates to the public health, safety, or welfare does not in itself bring that statute within the police power of a state, for there must always be an obvious and real connection between the actual provisions of the police regulations and its avowed purpose and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. A statute or ordinance which has no real, substantial, or rational relation to the public safety, health, moral or general welfare is a palpable invasion of rights secured by fundamental law and cannot be sustained as a legitimate exercise of the police power. One application of the familiar rule that the validity of an act is to be determined by its practical operation and effect and not by its title or declared purpose, is that a constitutional right cannot be abridged by legislation under the guise of police regulations. The exercise of the power must have a substantial basis and cannot be made a mere pretext for legislation that does not fall within it. The Legislature has no power, under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights.' "

The above language in *Noble* is applicable to § 2 of Act 252 of 1971 as amended, Ark. Stat. Ann. § 70-802, in the case at bar. It must be remembered that § 70-802 is not confined to the franchises sold by the appellee Block but the statute applies to all new franchises for use of a service mark, trade mark or trade name in Arkansas. The statute applies to motel and quick food business as well as the income tax and other businesses. We can only construe the statute as an attempt to insure to Arkansas franchisees a minimum price for a franchise. As we interpret § 70-802, it simply attempts to insure to Arkansas businessmen who purchase a franchise for the use of a service mark, trade mark or trade name, that they shall receive such franchise at the lowest price in the nation without relation to the public safety, health, moral or general welfare. Consequently, we hold that Section 2 of Act 252 of 1971 as amended, Ark. Stat. Ann. § 70-802 (Supp. 1973), is unconstitutional.

The judgment of the trial court is, therefore, affirmed.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur because I do not think Ark. Stat. Ann. § 70-802 (Supp. 1973) applied to this transaction. In this respect I agree with the circuit judge and disagree with the majority. This franchise was not a new one, in my opinion. I do not understand how the majority concluded that it is, except by saying so. At the very most, there was a question of fact, resolved against appellees by the circuit judge "sitting as a jury." The result of the court's holding is that only a change in terms of an existing franchise made by rewriting the agreement would make it a new one. This intention certainly does not appear from the statute.

I would not consider the constitutional question, because, in my view, the judgment should be affirmed on the basis of the circuit judge's holding. This would render consideration of the constitutional question improper.