John F. WELLS, et al *v.* Paul RIVIERE, Secretary of State of the STATE of Arkansas

80-100                                        599 S.W. 2d 375

Supreme Court of Arkansas
Opinion delivered June 2, 1980

158

*James F. Lane*, for appellants.

. *Steve Clark*, Atty. Gen., by: *Russell Meeks*, Deputy Atty. Gen., for appellee.

*W. J. Williams*, of *Wright, Lindsey & Jennings*, for intervenor, Robert Harvey.

DARRELL HICKMAN, Justice. The question presented by this appeal concerns the constitutional authority of the Arkansas General Assembly to act after a regular 60-day session. In order to properly examine that issue, it is necessary to relate in detail the proceedings in the trial court and the undisputed facts.

This suit began in the Chancery Court of Pulaski County. John F. Wells filed a taxpayers lawsuit, individually and on behalf of the Independent Voters of Arkansas, Inc. against Paul Riviere, the Arkansas Secretary of State. Wells sought an injunction to prevent Riviere from proceeding to place three proposed constitutional amendments on the ballot in the General Election of November, 1980.

The three proposed constitutional amendments relate to the assessment of property and taxation (Senate Joint Resolution 1), usury (House Joint Resolution 9, and the jurisdiction and venue of Arkansas courts (House Joint Resolution 10.)

Robert Harvey, a taxpayer, was allowed to intervene in support of the validity of the property assessment and taxation amendment, Senate Joint Resolution 1.

The parties stipulated to the relevant facts, and all parties filed motions for summary judgment. The chancellor found that the three proposed amendments to the Constitution had been properly adopted by the General Assembly and denied the request for an injunction.

There are no procedural problems with this case. The appellants have the right to sue as taxpayers to prevent an illegal exaction. Ark. CONST. art. 16, § 13. The chancellor also had jurisdiction.

The question to us is one of the constitutional authority granted to the legislative branch of Arkansas government. The General Assembly is authorized by Ark. CONST. art. 19, § 22 to propose amendments to the Constitution. However, the proposed amendments cannot exceed three in number and must be approved by a majority of the members of each house at a *regular* session of the General Assembly.

The appellants argue that since the proposed amendments were not approved at a regular session, they were not legally proposed and should not be certified to the voters for approval or rejection.

There are only two kinds of sessions of the General Assembly in Arkansas. A regular biennial session of the General Assembly is provided for in Ark. CONST. art 5, §§ 5 and 17.

The only other session of the General Assembly authorized by the Arkansas Constitution is one convened by the governor on extraordinary occasions. Ark. CONST. art 6,

§ 19. *Purcell* v. *Jones*, 242 Ark. 168, 412 S.W. 2d 284 (1967). It is agreed that the General Assembly was not in a special session when it approved the three proposed amendments.

The facts are that the Seventy-Second General Assembly of Arkansas convened at its regular session on January 8, 1979. After it convened, Senate Concurrent Resolution 14 was adopted extending the sixty-day regular session. The resolution provided that the General Assembly found that it would be impossible to consider all the measures introduced within sixty days and, therefore, an extension of the regular session was necessary. There was no time limit to the extension.

On April 4, 1979, the General Assembly recessed; it reconvened on April 20, 1979. On April 20th, by Senate Concurrent Resolutions 91 and 92, the regular session recessed for 20 months until January, 1981.

Senate Concurrent Resolution 91 actually provides five things, First, it confirmed that the General Assembly had extended itself indefinitely. Second, it says that it may reconvene on May 9, 1979, for limited purposes. Third, it says it may reconvene the second Monday in January, 1980. Fourth, it says, notwithstanding these other three provisions, the regular session of the Seventy-Second General Assembly is extended until the second Monday in January, 1981. That is the same day that the next General Assembly, the Seventy-Third, convenes. The resolution concludes by providing that the Speaker of the House of Representatives and the President pro tem of the Senate may reconvene the Seventy-Second General Assembly at any time by their joint proclamation.

The actual language of the resolution in each regard is as follows:

First, regarding the indefinite extension,

WHEREAS, the regular session of the Seventy-Second General Assembly has been *extended indefinitely* in the

manner authorized in the Arkansas Constitution . . . [Emphasis added.]

Second, regarding the reconvening of the General Assembly in May:

SECTION 3. Notwithstanding other provisions of this Resolution, the Seventy-Second General Assembly may be reconvened on the Wednesday, May 9, 1979 by joint proclamation of the Speaker of the House of Representatives and the President Pro Tem of the Senate declaring the need for such reconvened session. In the absence of such proclamation, the Seventy-Second General Assembly *shall continue in recess as provided in this Resolution*. [Emphasis added.]

Any session reconvened pursuant to this Section 3 shall be for the sole purpose of:

(1) correcting errors going to the validity of bills passed prior to the recess,

(2) appropriate action on fiscal matters including but not limited to appropriation bills, revenue bills, purchasing and accounting procedures, and revenue classification and allocation,

(3) reconsideration of bills or parts of bills disapproved by the Governor,

(4) referral of matters to standing, select, or special committees or to the Joint Interim Committees for action or study, or

(5) matters of rules and procedures.

Upon recess of a session reconvened pursuant to this Section 3, all business then pending in committee or on the calendar shall become a nullity, except a proposed amendment of the Arkansas Constitution previously adopted by both houses and except matters of rules and procedures.

Third, relating to the reconvening in January, 1980:

SECTION 4. Notwithstanding other provisions of this Resolution, the Seventy-Second General Assembly shall reconvene on the second Monday in January, 1980, unless the Speaker of the House of Representatives and the President Pro Tem of the Senate by joint proclamation declare that there are no substantive matters requiring the attention of the Seventy-Second General Assembly. In the event that the Speaker of the House and President Pro Tem of the Senate determine that there is no need for reconvening of the Seventy-Second General Assembly on the second Monday in January, 1980, the Seventy-Second General Assembly shall *continue in recess* as otherwise provided herein. [Emphasis added.]

Fourth, Section 1 declares that the General Assembly is recessed until the same day that the Seventy-Third General Assembly is convened. It reads:

SECTION 1. At the close of business on a day mutually agreed to by the House of Representatives and the Senate pursuant to this Resolution, the Seventy-Second General Assembly *shall stand in recess until the second Monday in January, 1981*, at which time, prior to the convening of the Seventy-Third General Assembly, the Speaker of the House of Representatives and the President Pro Tem of the Senate of the Seventy-Second General Assembly shall adjourn their respective bodies sine die, unless the Seventy-Second General Assembly shall, at an earlier session thereof, decide on an earlier date for sine die adjournment. [Emphasis added.]

Fifth, the language of the resolution regarding reconvening at any time reads:

SECTION 5. The Seventy-Second General Assembly, standing in recess, *may be reconvened at any time* by joint proclamation of the Speaker of the House and President pro tem of the Senate or by joint address of a majority of the members elected to each house of the Seventy-Second General Assembly. [Emphasis added.]

Apparently the General Assembly did not reconvene in May as provided for in Section 3.

It did reconvene in January, 1980, and at that "session" adopted the three proposed amendments in question. After adopting these proposals, it recessed again, still not adjourning sine die. It is still in an "indefinite recess" or "indefinitely extended" until January, 1981. Was the "session" in January, 1980, a regular session, a lawful extension of a regular session? If it was not, the proposed amendments were not properly adopted because a legislature cannot enact legislation after the expiration of its session. *State, ex rel Heck's Discount Center, Inc.* v. *Winters*, 147 W. Va. 861, 132 S.E. 2d 374 (1963). See also, *Dillon* v. *King*, 87 N.M. 79, 529 P. 2d 745 (1974).

The Arkansas Constitution provides only for biennial session of the General Assembly. Ark. CONST. art 5, § 5.

Section 5. Time of meeting — The General Assembly shall meet at the seat of government every two years on the first Tuesday after the second Monday in November [second Monday in January] until said time be altered by law.

The duration of such a session is controlled by Article 5, § 17, which reads:

Section 17. Duration of sessions. — The regular biennial session shall not exceed sixty days in duration, unless by a vote of two-thirds of the members elected to each house of said General Assembly. . . .

A fair reading of the Constitution cannot mean that the General Assembly can legally extend a session indefinitely for no valid legislative purpose, nor indefinitely go into a recess so that it may later reconvene itself and conduct its business as though it were in a regular session.

On the other hand, there is no doubt, that by two-thirds vote of the members of the General Assembly, a regular session can be lawfully extended beyond the sixty days of a

regular session. Ark. CONST. art 5, § 17. It is a question of fact as to whether such an act is lawful.

When all the relevant provisions of the Arkansas Constitution are read together, the Constitution prohibits the General Assembly from legally doing what it did in this case.

Article 5, § 17 says: "The regular biennial session shall not exceed sixty days in duration." Article 5, § 5 provides only for a meeting of the General Assembly every two years. Article 6, § 19 gives the governor power to convene the General Assembly on extraordinary occasions. Those are the Constitutional provisions limiting the sessions of the General Assembly to one biennial 60-day session, unless lawfully extended. In *Purcell* v. *Jones, supra*, we said:

> . . . It is a rule of universal application that the Constitution must be considered as a whole, and that, to get at the meaning of any part of it, we must read it in the light of other provisions relating to the same subject. *Chesshir* v. *Copeland*, 182 Ark. 425, 32 S.W. 2d 301. The Constitution is to be construed according to the sense of the terms used and the intention of its authors. *Rankin* v. *Jones*, 224 Ark. 1001, 278 S.W. 2d 646.

There is no doubt that the General Assembly sees its duty in these modern times as requiring it to be available at all times to handle the business of this state. But that belief cannot be realized by circumvention of Arkansas' 1874 Constitution.

The General Assembly does a great deal of its work through its committees and the Legislative Council, which meet regularly throughout the year. With this general practice there is no legal quarrel. However, a session of the General Assembly is one essentially involving the function of considering and passing legislation; it necessarily involves the entire legislative branch of government, and in that regard the Constitution limits the meeting of the General Assembly to a regular biennial session that can only be extended to finish legislative work — passing on legislation.

The General Assembly found on April 20, 1979, in its resolution approving the indefinite recess, *that it had completed its business*. That resolution, Senate Concurrent Resolution 92, begins:

> WHEREAS, the Seventy-Second General Assembly *has completed its essential business*; . . . [Emphasis added.]

Thereafter, Resolution 92 approved Senate Concurrent Resolutions 91 which we have quoted almost in its entirety.

If we were to approve Senate Concurrent Resolution 91, and actions of the General Assembly in this case, on these facts, we would be holding that the General Assembly can extend itself indefinitely, meet at any and all times, monthly, biannually or annually for any and all reasons. The General Assembly simply does not have that power under the Arkansas Constitution. Arkansas' Constitution contemplates the General Assembly will convene once every two years, meet for 60 days, or longer if necessary, but finish its buisness and go home. Only the executive branch of government is granted the authority to reconvene the General Assembly if it becomes necessary.

Also, too many of the provisions of the Constitution would become meaningless if the General Assembly could act as it proposes. For example, only the governor has the authority to call the General Assembly into a session after a regular session. That is an important constitutional power granted to the executive branch of the government. It would become meaningless if the General Assembly could meet any time it chose and call it a regular session. The same provision that authorizes the governor to convene a special session of the General Assembly does grant the General Assembly the authority to remain in session for no more than 15 days, after it has finished with the governor's business. That is a grant of power to the General Assembly to check any abuse of power by the executive branch in calling a special session.

The appellee, and especially the intervenor, argue that Resolution 91 left open the question of a constitutional amendment regarding property taxation and, therefore, the

General Assembly could properly consider arguments to the Constitution in its meeting in 1980. It is argued that such a subject was pending legislation at the time the General Assembly recessed and that it could be lawfully considered at a later time. It is true that both houses of the General Assembly had approved a proposed amendment to the Arkansas Constitution regarding property taxation. However, at the same time it is conceded there had been no joint approval of any other amendments. The usury and court jurisdiction amendments were first approved by both houses in January, 1980 and even the proposed amendment regarding property taxation, as it was finally approved in January, 1980, was a different proposal than that approved back during the regular session in 1979. A vague reference in Resolution 91 referring to any jointly approved proposed amendments is not enough to justify holding that the meeting of the General Assembly of 1980 was a lawful extension of a regular session. That is too small a nail upon which to hang such a large cloak. If Resolution 91 is anything, is is a claim, clearly staked out by the General Assembly that it can meet at any time and consider any subject matter that it deems proper. Such a posture, if approved, would strike a serious blow to the checks and balances that exist in Arkansas government, severely limiting the constitutional authority of the executive branch of government. Consequently, we cannot accept this argument in the light of all the other language in Resolution 91.

We do not mean to unduly limit the authority of the General Assembly to go into recess, adjourn or reconvene as it is necessary to finish its business. That authority is clear. And essentially the General Assembly decides — not we — whether it has finished its business and whether an extension of the regular session is required. But even a conceded power can be exercised in an unconstitutional manner. While a legislative declaration creates a strong presumption of legality, that presumption can be rebutted by objective facts that are inconsistent with such a declaration. Are there sufficient facts to find that the General Assembly had a purpose in recessing for 20 months? We do not find evidence to support such a purpose. For example, in Senate Concurrent Resolution 14 the General Assembly determined the regular session

had to be extended in order for it to finish its regular business. Then, rather than staying in the regular session, it was decided that the General Assembly would go into a recess for 20 months. What action could the General Assembly take in January, 1981? All pending business had been declared void except a reference to proposed constitutional amendments that may have passed both houses. Such proposed amendments could not have been taken up in 1981 because that is a time beyond the election which would decide the validity of such amendments. Consequently, what purpose could the General Assembly have had in recessing for 20 months? While Resolution 91 declared that it might be necessary to reconvene in May of 1979 and January, 1980, at the same time the May session could only be convened by order of the Speaker of the House of Representatives and the President pro tem of the Senate, and the January, 1980 session would be held unless those same officials declared the session unnecessary. On the one hand the General Assembly declares that it needs to meet, then it recesses for 20 months. On the other hand the General Assembly declares that it has finished its essential business, but now argues that it has pending business that it can consider at any time during the 20-month recess. Now it is argued that any constitutional amendments can be considered because reference was made to those that had passed both houses. All pending matters were voided, but now it is argued new subjects may be addressed. Such an argument can only be based on the broad language in Resolution 91.

The intent of the General Assembly, gathered from all of the evidence, is that it did not legally recess or attempt to extend a regular session to finish its regular business. Most important, is the attempt by the General Assembly to recess for 20 months, reserving the power to call itself back at any time for any purpose. That is the concept, without any real purpose, that exceeds the constitutional power of the General Assembly to extend a regular session — the claim of the right to recess and reconvene for any reason the General Assembly later deems necessary. We can only conclude that the actions of the General Assembly in January, 1980, were not during a lawful extension of a regular session.

We do not have the question before us of whether it would have been lawful for the legislature to meet in May, 1979, as it proposed, and consider legislation or matters that were set out in detail in Resolution 91. The facts would support such action by the General Assembly. What we have before us is a meeting the next year called pursuant to the other language in Resolution 91.

In an affidavit, by the Speaker of the House, which is part of the record, it is stated that committees of the Seventy-Second General Assembly are actively engaged in handling legislative matters and this fact, as well as others, are evidence that the General Assembly had not completed its official business. Work through committees is not the same as work by the General Assembly in a session when all its members are present or authorized to be present.

When we review all the facts, we can only conclude that the regular session of the General Assembly of 1979 was not extended lawfully to 1980 as claimed by the appellee and the intervenor.

Finally, it was contemplated, with good cause, that proposals made by the General Assembly to change the Constitution would be proposed at a regular session. Time is an important factor. Those amendments must be published in newspapers at least six months in advance of the general election. Ark. Const. art 19, § 22.

We do not even imply that we have the authority to dictate to the General Assembly, the legislative branch of this state government, how it proceeds about its business. It can convene as it pleases. *Wells* v. *Purcell*, 267 Ark. 456, 592 S.W. 2d 100 (1979). However, whether its acts are lawful is a matter for this court. That was decided by the United States Supreme Court in an opinion written by Chief Justice John Marshall in *Marbury* v. *Madison*, 1 Cranch 137 (1803).

The result of our views is that a majority of the Court, consisting of Justices George Rose Smith, Hickman, Purtle, and Mays, hold that the usury amendment and the jurisdiction amendment were not proposed at a regular session of the

General Assembly and therefore should not be placed on the ballot. A different majority, consisting of the Chief Justice and Justices Holt, Purtle, and Stroud, hold that the property tax amendment was properly proposed and should be placed on the ballot. The decree of the trial court is therefore affirmed in part and reversed in part.

GEORGE ROSE SMITH and MAYS, JJ. join in this opinion.

PURTLE, J., concurs in part and dissents in part.

FOGLEMAN, C.J., HOLT and STROUD, JJ., dissent.

GEORGE ROSE SMITH, Justice, concurring. I join in Justice Hickman's opinion, but I wish to add the dissenting opinions of the Chief Justice and of Justice Stroud are fundamentally in error in assuming that the court is passing upon the validity of an exercise of *legislative power*. That power is almost invariably defined as the authority to make, alter and repeal *laws*. See *Gregory* v. *Cockrell*, 179 Ark. 719, 18 S.W. 2d 362 (1929).

Our Constitution has a great deal to say about the enactment of laws, which is the exercise of legislative power. No law shall be passed except by bill. No bill shall become a law unless it has an enacting clause and is passed in a certain way. All bills are subject to the governor's veto and to possible approval or disapproval by popular referendum.

The General Assembly's power to make, alter, and repeal laws is not even involved in this case; so the presumption of legislative authority has nothing to do with the question. We are simply interpreting part of that language in the Constitution which creates the framework of state government — here the legislative branch. The authors of the Constitution declared in the clearest imaginable language that the General Assembly shall meet every two years in a 60-day regular session, that the General Assembly may extend the regular session by a two-thirds vote, and that between regular sessions the governor may call the legislators into special session. The language of the Constitution is so plain that it really needs no interpretation. But if, as the dis-

senting opinions argue, the decision of the General Assembly to recess indefinitely is an exercise of legislative power, then the General Assembly has become the final interpreter of the Constitution.

JOHN I. PURTLE, Justice, concurring in part; dissenting in part. The issues presented here are extremely important to every citizen of the state of Arkansas. Having no precedent or case law to guide our opinion, we are left with only our common sense and our power to reason. It is only natural that there are differences of opinion in matters of such importance which have not previously been interpreted by the courts.

In order to set forth a rational and logical basis for this concurring and dissenting opinion, I believe it is best to begin with the Preamble of the Constitution of the State of Arkansas which states:

> We, the people of the State of Arkansas, grateful to Almighty God for the privilege of choosing our own form of government, for our civil and religious liberty, and desiring to perpetuate its blessings and secure the same to ourselves and posterity, do ordain and establish this Constitution.

The source of power is described in Art. 2 § 1, Constitution of Arkansas:

> All· political power is inherent in the people and government is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same in such manner as they may think proper.

The separate departments of government were established by the people in Art. 4 § 1 as follows:

> The power of government of the State of Arkansas shall be divided into three distinct departments, each of them to be confined to a separate body of magistracy, to-wit: Those which are legislative to one, those which

are executive to another, and those which are judicial to another.

The constitution next separates the three governmental departments by prohibiting any person or persons in one department from exercising any power inherent to either of the other two departments. Art. 4 § 2. Naturally, the legislative powers granted by the people rest in the Senate and House of Representatives. Neither the legislative, executive or judicial departments have any power not granted to them, by the people, in the constitution and amendments thereto.

The people declared through Art. 5 § 17 that the regular biennial session of the legislature shall not exceed 60 days unless such session is extended by a two-thirds vote of each house of the General Assembly. Several other specific restrictions were expressly provided. However, the plain reading of the constitution clearly demonstrates the people did not intend the General Assembly to remain in session for two years. It is likewise apparent that the people reserve to themselves the right to change the constitution as they think proper. Up until this time the citizens have not seen fit to change the constitution to require or allow the General Assembly to remain in permanent session. No doubt, the people anticipated the possible need for sessions of the General Assembly between regular sessions; and, for this purpose, they wisely provided for extra sessions through Art. 6 § 19 which states:

> The Governor may, by proclamation, on extraordinary occasions convene the General Assembly . . . and he shall specify . . . the purpose for which they are convened . . . after which they may, by a vote of two-thirds of all the members . . . remain in session not exceeding fifteen days.

This being a case of first impression, we should face the issue squarely and use our common sense in trying to interpret the intent of the people when they adopted the constitution. Obviously, the voting citizens expected the General Assembly to complete its business on the basis of a biennial 60-day regular session. It is also apparent that the people

realized there might be times when the General Assembly could not complete its work within the 60 days allotted; therefore, they added the provision for extending the session. No doubt, the extension was intended for the time necessary to complete the business then pending before the General Assembly. It seems obvious the people expected the General Assembly to adjourn sine die after completion of all pending business.

It is not unreasonable to read into the powers granted to the legislative branch the right to recess to afford adequate time to prepare the materials necessary to intelligently complete any pending business. There is not the slightest hint that the people intended an "on again"/"off again" session extending over the entire biennium. It was with the expectation that the General Assembly would stand adjourned after completion of its business that the Governor was given authority to convene the General Assembly. Otherwise, there would have been no need to grant the Governor this power.

Even then, a safety valve was attached to the special sessions which might be called by the Governor; and, that safety valve allowed the special session the right to remain in session after the expiration of the Governor's extraordinary session for a period of 15 days. Had the people desired the General Assembly to remain in recess after completion of pending business, this matter would have been easy and simple to state.

As noted earlier in this opinion, the people reserve the right to change the constitution as they deem proper. In furtherance of this idea, Art. 19 § 22 provided the General Assembly with the authority to propose up to three constitutional amendments during a regular session. The General Assembly was not empowered to change the constitution but was merely empowered to suggest changes for the consideration of the people. Subsequently, the people realized the General Assembly could not possibly propose all the changes the general public thought were needed; therefore, amendment VII to the constitution was adopted in 1920. This amendment specifically provided the procedure to be utilized by the people in proposing changes to the constitution.

Amendment VII also provided a means for the people to ratify or reject actions taken by the General Assembly. The referendum part of amendment VII states in part:

> . . . Such petition shall be filed with the Secretary of State not later than ninety days after the final adjournment of the session at which such act was passed, except when a recess or adjournment shall be taken temporarily for a longer period than ninety days; . . .

It appears the people had realized the General Assembly may need to recess for a period in excess of 90 days. Nevertheless, it is still obvious they expected the General Assembly to recess up to the day before the commencing of the next assembly could allow a referendum petition to be filed in March of 1981 on a measure enacted in January of 1979. Such results were clearly not intended nor envisioned by the people of Arkansas when they adopted the constitution and amendment VII.

The 72nd General Assembly convened on January 8, 1979, and remained in continuous session until April 4, 1979. At that time it recessed until April 20, 1979, and on this day it convened and recessed until January 7, 1980. After meeting for ten days it then recessed, on January 17, 1980, until January 1981. Thus, we see the 72nd General Assembly has had or will have had at least four sessions during the two years for which it was elected. If the legislature has this power, it has the power to convene and recess as often as it desires for the entire two years.

I feel the majority opinion would in some instances thwart the intent of the framers of the constitution in allowing a reasonable extension of a session in order to allow for adequate preparation for completion of exceptional matters which sometimes confront the General Assembly. Although it is unusual to allow a recess as long as the one under consideration, it is not beyond reason. Therefore, I would hold under exceptional circumstances and for good cause shown a recess of several months is not absolutely beyond the limitations of the present constitution.

Nothing in this opinion is intended to indicate that this Court has any authority to supervise or control the activities of the legislature. It is, as stated in the majority opinion, an effort to determine the validity of certain actions taken by the General Assembly. It cannot be seriously argued that there is no limit to the authority of the General Assembly, and it cannot be argued that there is no limit to the power or authority of the executive or judicial branches of the government. All three branches are limited to whatever power the people delegated to them in the constitution and the subsequent amendments.

By placing limits on the regular and special sessions of the General Assembly, it is obvious there was no intent by the people to permit the legislature to remain in continuous session. Present proposals for constitutional changes do not include any provisions for them to remain in session for the entire biennium. To me, these are clear indications that the intent of the people was to allow the General Assembly enough time to complete action on all matters pending before it at a regular session.

A reasonable and logical interpretation would be to allow the General Assembly to extend a regular session for the period of time necessary to complete pending business. A necessary incident to this procedure would be to allow a recess for a period of time needed to allow a committee or committees to obtain information needed to complete the pending proposals before the entire assembly acted upon the matters.

In adherance to the ideas expressed above, I would hold the General Assembly was acting within its authority in declaring a recess to study the property tax proposal which was before it at the regular 72nd General Assembly. The fact that the proposal was modified after the recess did not change the nature of the pending business. There was, no doubt, general concern among the members of the General Assembly as to results of a recent Supreme Court decision relating to property taxes. Obviously, more information and time were needed to present a sound proposal to the people. Unless the General Assembly, or someone else, submitted an

acceptable proposal, this property tax matter would have been left to the local authorities.

If the Supreme Court decision had the effect of increasing the county, city, and school district taxes, this increase would be determined by the local authorities whether to accept the higher rates or change them because they have the power to do so. If, for example, a county had over the years paid only a part of its present legal obligation, its taxes would be raised to the standards set by the constitution and combined with a vote of the local taxing authorities. On the other hand, if another county had been paying more than its share of the taxes, it would be free to vote the rate lower to whatever level it deemed proper. Thus, the taxing authority would have been left primarily to local control as it related to property taxes.

Applying this line of reasoning to the other two proposals, HJR 9 and HJR 10, I would hold these proposals were outside the authority of the General Assembly to consider at the 1980 session or any session prior to the next regular session in January 1981. These two proposals were not pending before the General Assembly when it discontinued to meet in the regular session. Neither were they listed as items to be considered at some later date.

Intervenor, taxpayer Harvey, correctly contends that SJR 1 was a matter of business pending at the time of the recess. He correctly insists it was within the scope of the unfinished business and therefore a proper matter to consider after the unusually long recess. Although it stretches the rule of reasonableness almost to the breaking point, I would agree with Harvey, and the trial court, that SJR 1 was a proper and legal subject for legislative consideration and would allow it to be considered at the next general election.

To allow HJR 9 and HJR 10 to be considered would be in violation of the idea that the General Assembly must adjourn sine die after completion of all pending business. To allow new matters to be considered when the recess was for the purpose of gathering additional information and material

to complete pending matters would allow a continuous session for the entire biennium.

Therefore, I would affirm the trial court as to SJR 1 but reverse as to HJR 9 and HJR 10.

JOHN A. FOGLEMAN, Chief Justice, dissenting. I believe in the system of checks and balances. It works well only when the final arbiter of the boundaries between the three departments of government checks itself. The majority, in my view, is not doing that; instead, as I see it, the judicial branch has permitted itself to encroach upon the domain of the legislative branch, even to the extreme of deciding a question of fact, which was for independent determination by that branch. The majority fell into error by approaching the question upon the mistaken assumption that it was the duty of this court to determine what the constitution authorized the General Assembly to do. The duty of this court is to determine whether the constitution, expressly or by *clear* implication, *prohibited* it from doing what it did. I submit that it did not, so I join in the dissenting opinion of Mr. Justice Stroud.

JOHN F. STROUD, Justice, dissenting. The majority opinion erroneously states "The question to us is one of the constitutional authority granted to the legislative branch of Arkansas government." The question is not one of a grant of power, but rather, whether there is a limitation of power. This fundamental rule was clearly expressed in *Bush* v. *Martineau*, 214 Ark. 174, 295 S.W. 9 (1927) when the court said:

> ... [T]he Constitution of this State is not a grant of enumerated powers to the Legislature, not an enabling, but a restraining act (*Straub* v. *Gordon*, 27 Ark. 629), and that the Legislative may rightfully exercise its powers subject only to the limitations and restrictions of the Constitution of the United States and of the State of Arkansas.

This basic constitutional premise has been followed by this court throughout our statehood. *State* v. *Ashley*, 1 Ark. 513 (1839); *Straub* v. *Gordon*, 27 Ark. 625 (1872); *Vance* v. *Austell*, 45 Ark. 400 (1885); *Carson* v. *St. Francis Levee Dist.*, 59 Ark. 513,

27 S.W. 590 (1894); *St. Louis, I.M. & S. Ry. Co.* v. *State*, 99 Ark. 1, 136 S.W. 938 (1911); *Butler* v. *Board, etc.*, 99 Ark. 100, 137 S.W. 251 (1911); *Connor* v. *Blackwood*, 176 Ark. 139, 2 S.W. 2d 44 (1928); *Adams* v. *Spillyards*, 187 Ark. 641, 61 S.W. 2d 686 (1933); *Newton* v. *Edwards*, 203 Ark. 18, 155 S.W. 2d 591 (1941); *Hickenbottom* v. *McCain*, 207 Ark. 485, 181 S.W. 2d 226 (1944); *Peugh* v. *Oliger*, 233 Ark. 281, 345 S.W. 2d 610 (1961); *Berry* v. *Gordon*, 237 Ark. 547, 376 S.W. 2d 279 (1964); *Rockefeller* v. *Hogue*, 244 Ark. 1029, 429 S.W. 2d 85 (1968); *Jones* v. *Mears*, 256 Ark. 825, 510 S.W. 2d 857 (1974); *Hand* v. *H&R Block, Inc.*, 258 Ark. 774, 528 S.W. 2d 916 (1975).

Five months ago, this court again reiterated the proposition in *Wells* v. *Purcell*, 267 Ark. 456, 592 S.W. 2d 100 (1979):

> It must always be remembered that the state's constitution is neither an enabling act nor a grant of enumerated powers, and the legislature may rightfully exercise the power of the people, subject only to restrictions and limitations fixed by the constitutions of the United States and this state. *Jones* v. *Mears*, 256 Ark. 825, 510 S.W. 2d 857; *St. L.I.M. & S. Ry. Co.* v. *State*, 99 Ark. 1, 136 S.W. 938. Under our system of government the legislature represents the people and is the reservoir of all power not relinquished to the federal government or prohibited by the state constitution. *Rockefeller* v. *Hogue*, 244 Ark. 1029, 429 S.W. 2d 85; *Hackler* v. *Baker*, 233 Ark. 690, 346 S.W. 2d 677.

To determine if the three proposed constitutional amendments were validly adopted by the Arkansas General Assembly at the extended session of the legislature in January of 1980 requires a review of the relevant provisions of the Arkansas Constitution and cases construing them.

Article 5 of the Constitution establishes the Legislative Department as a separate and independent branch of government. In § 5 of that article, the date of the meeting of the General Assembly every two years is defined, but the article continues "until said time be altered by law." The legislature has exercised that right and changed the date by the adoption of Ark. Stat. Ann. § 4-101 (Repl. 1976). It also exercised its

inherent power with the adoption of Ark. Stat. Ann. § 13-339 (Repl. 1979) which changed the biennial period from two consecutive calendar years to a fiscal period beginning on July 1st and ending June 30th two years thereafter. We determined in *Wells* v. *Purcell*, supra, that as the legislature is a separate and coordinate branch of government, we have no authority to supervise or control its actions by writ of mandamus or otherwise interfere with the legislative process, but we do have the authority and power to determine the validity of its legislative acts.

There is no contention in this case that the session which began on January 7, 1980, was a special session called by the Governor. Therefore, the reconvened extended session was either a *regular session* or it was void, as held by the majority.

Article 19, § 22 of the Constitution, in setting out the procedure the General Assembly must follow to propose constitutional amendments at a general election, provides:

> Either branch of the General Assembly at a *regular session* thereof my propose amendments to this Constitution . . (Emphasis added.)

The regular biennial session of the legislature may be extended beyond 60 days pursuant to Art. 5, § 17 which provides that "The regular biennial sessions shall not exceed sixty days in duration, unless by a vote of two-thirds of the members elected to each house of said General Assembly . . . "There is no limitation placed on the duration of such an extension in this or any other article of the constitution. The framers of the constitution did, however, impose a limitation on the duration of the extention of a special session in Art. 6, § 19:

> The Governor may, by proclamation, on extraordinary occasions convene the General Assembly at the seat of government, or at a different place, if that shall have become since their last adjournment dangerous from an enemy or contagious disease; and he shall specify in his proclamation the purpose for which they are convened, and no other business than that set forth therein shall be

transacted until the same shall have been disposed of, after which they may, by a vote of two-thirds of all the members elected to both houses, entered upon their journals, *remain in session not exceeding fifteen days.* (Emphasis added.)

An inflexible limitation on the extension of a regular session could just as easily have been included in the document. The failure of the framers of the constitution to do so is perhaps the best evidence that they did not want a maximum stated. Some of the drafters may have had sufficient vision to anticipate that the passage of time would result in a growth and complexity of life that would require more and longer legislative sessions to handle the affairs of government. Obviously, the electorate intended to discourage, but not prohibit, long sessions by the adoption in 1913 of Amendment No. 5 to the Constitution which eliminated all per diem of legislators after 15 days of an extraordinary session and after the first 60 days of any regular session, although this restriction has since been removed. Also of significance is the fact that the constitution places no restriction on the legislature in determining when they will adjourn, with one exception not applicable here. See Art. 6, § 20.

It is not our prerogative to judge the wisdom of legislative actions nor to determine whether that body has abused the power reserved to it by the people. This court made its position very clear in that regard in *Wells* v. *Purcell*, supra, when it said:

The legislature is responsible to the people alone, not to the courts, for its disregard of, or failure to perform, a duty clearly enjoined upon it by the constitution, and the remedy is with the people, by electing other servants, and not through the courts. *Fergus* v. *Marks*, 321 Ill. 510, 152 N.E. 557, 46 ALR 960 (1926); *Fouracre* v. *White*, 7 Boyce (Del.) 25, 102 A. 186 (1917); *Person* v. *Doughton*, 186 N.C. 723, 120 S.E. 481 (1923). See also, *In re Senate Resolution 4*, 54 Colo. 262, 130 P. 333 (1913).

The majority has correctly indicated that it is for the General Assembly to decide whether it has finished its

business and whether an extension of the regular session is required. But incredibly they have held that the decision of the legislature in that regard is a question of fact subject to review by this court. No authority in the constitution or in any prior decision of this court is offered in justification of that position. This encroachment into the legislative process not only substantially abuses the doctrine of separation of powers, but also casts a pall over all legislation adopted at extended sessions of the legislature.

For the reasons expressed in this opinion, I would affirm the judgment of the Chancellor in finding that the three proposed constitutional amendments were validly acted upon at a regular session of the legislature.

FOGLEMAN, C.J., and HOLT, J., join in this dissent.